## ATTACHMENT A - STORAGE UNITS 216 AT

## TRI-STATE SELF STORAGE-100 HICKMAN ROAD

**Storage Unit 216, 100 Hickman Road, Claymont, Delaware, 19703** are more particularly described as individual storage units within a large outdoor self-storage facility, on the east side of 100 Hickman Road, Claymont, Delaware, comprised of long rows of individual storage units, each individually numbered. A sign on the property describes the business as "TRI STATE MINI STORAGE." Each individual unit has an orange garage type roll up door. The property has a large automated steel gate at the entrance to the business. Unit 216 bears those respective numbers on the top center of the door frame for each of the units.

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT FOR
## STORAGE UNITS

I, William J. Campbell, (hereinafter "Agent Campbell" or "your affiant") being duly sworn,

depose and state that:

I am the affiant for the search warrant for the storage units E-210 and E-265 at Tri-
State Self Storage, 100 Hickman Road, Claymont, DE 19703, I attach my affidavits *2|6|08*
and incorporate it by reference.   *audekk. I am also the affiant for the search*
*then*              *warrant for the storage units 460, 468, 565 at Tri-State Self*
                                                                *Storage.*
On February 8, 2008, pursuant to search warrants issued by the United States District   *1050 Ridge*
Court for the District of Delaware, law enforcement searched five storage units used    *Road.*
by C. Singh to store contraband cigarettes. Law enforcement found contraband
cigarettes in each of the units.

In at least one unit, law enforcement found counterfeit Delaware tax stamps.

A review of storage unit records from TriState Self Storage reveals that as of January
8, 2008, C. Singh had rented in his own name two additional units at TriState-Ridge
Road -- units 394 and 526.   At the TriState-Hickman Road location, records reveal
that as of January 8, 2008, unit 216 was rented by S. Singh, the wife of C. Singh.

Based on the information contained in the incorporated affidavit, your affiant believes
there is probable cause that M. Singh and S. Singh are complicit in C. Singh's
contraband cigarette trafficking. Because law enforcement found contraband
cigarettes and/or counterfeit Delaware cigarette tax stamps in each of the units
searched, your affiant believes there is probable cause to search TriState-Ridge Road
units 394 and 526, and TriState-Hickman Road unit 216.

William J. Campbell
Special Agent, ATF

Dated: February 8, 2008

Subscribed to and sworn before me this 8th day of February, 2008.

HONORABLE LEONARD P. STARK
UNITED STATES MAGISTRATE JUDGE

1

## ATTACHMENT B

## ITEMS TO BE SEIZED

For items 1 through 9 inclusive, the items to be seized are for the time period January 2004 to the present.

1.    Books, records, receipts, notes, ledgers, or electronic data relating in any way to the importation, transportation, ordering, purchase, sale, taxation and/or distribution of contraband cigarettes, counterfeit cigarette tax stamps, and/or illegal cigarette sales or diversions;

2.    Papers, tickets, notes, receipts, passports and other items relating to domestic and international travel.

3.    Books, records, invoices, receipts, records of real estate transactions, records of purchase, sale and financing of assets and investments, including stocks, bonds and other securities, bank statements and related records, passbooks, money drafts, loans, letters of credit, money orders, bank drafts, cashier's checks, credit and debit cards, bank checks, money orders or any other negotiable instruments, safe deposit box keys (as well as applications, records of payment for and/or entry records of all safe deposit boxes), money wrappers, and other items relating in any way to the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of contraband cigarette trafficking proceeds and/or proceeds from illegal cigarette/counterfeit stamp sales or diversions;

4.    Bank and financial institution records and other records showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency.

5.    Photographs, records, and documents -- including still photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides -- containing

38

information regarding the identities of coconspirators or those involved in contraband cigarette trafficking and/or illegal cigarette/counterfeit cigarette tax stamps sales;

6.      Any papers, records or electronic data reflecting names, addresses, telephone numbers, IP or e-mail addresses, pager numbers, facsimile numbers and/or telex numbers of co-conspirators, sources of contraband cigarettes, and contraband cigarette/counterfeit cigarette tax stamp customers, which may be found in (but not limited to) the following media: address and/or telephone books, rolodex indices, electronic personal organizers, calendars, papers, web sites, telephone paging devices (and the memory thereof), and mobile cellular telephones (and the memory thereof);

7.      Indicia of occupancy, residency, and ownership or use of the Subject Premises any computers searched, and including, but not limited to, utility, telephone, and Internet access bills, insurance records, canceled envelopes, rental, purchase or lease agreements, identification documents and keys, to include storage facility keys;

8.      For Raj, Inc. and/or American Cigarette Outlet, Inc., reports and accountant's workpapers concerning preparation of financial records and reports and audits, including, but not limited to, audited and unaudited financial statements, expense and revenue summaries, trial balances, changes in working capital, cash flow analysis, cost analysis, financial forecasts, and correspondence.

9.      Tax returns (both federal and state, sales, and employment tax returns and any amendments) for Raj., Inc., American Cigarette Outlet, Inc., Charanjit Singh, Sunit Singh (nee: Chawla), Mandeep Singh, and Manjoth Singh for the tax years 2004 through 2007.

10.     United States and/or foreign currency, rare coins, precious metals, jewelry, and financial instruments, including stocks and bonds, and in amount or with a value in excess of approximately $1,000;

11.     Articles of Incorporation, corporate minutes, and/or any partnership agreements for Raj, Inc. and/or American Cigarette Outlet, Inc.

12.    Records indicating the purchase, lease, rental, or possession of real estate.

13.    Cigarette tax stamps, whether genuine or counterfeit, and any materials used in making cigarette tax stamps, to include computer images and stamping stock.

14.    Untaxed and/or contraband cigarettes and their packaging.

The above paragraphs 1 through 14, inclusive, include all of the foregoing items of evidence in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stores, including, but not limited to, any handmade form (such as writing); any photocopies; any mechanical form (such as printing or typing); any electrical, electronic, or magnetic form or data (such as any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-Roms, flash (thumb) drives, printer buffers, as well as printouts or readouts from any magnetic storage device.)

In addition, computer hardware, software, documentation, passwords, data security devices, and data, as further described below and in the affidavit incorporated by reference into this search warrant, are also to be seized and searched off-site in the matter which is also described below, and in the affidavit incorporated by reference into this search warrant. "Mirroring," imaging," and/or replication are also authorized.

The items to be seized include any and all electronic devices that are capable of analyzing, creating, displaying or transmitting electronic or magnetic computer impulses or data. These devices include computers, cell phones, telephones, electronic organizers, personal digital assistants (PDAs), fax machines, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryptions circuit boards, optical scanners, external hard drives, and other computer-related electronic devices.

The items to be seized include any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.

The items to be seized include any and all written or printed material that provides instructions or examples concerning the operation of a computer system, computer software and/or any related device.

The items to be seized include any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment. This media includes, but is not limited to, floppy disks, diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and any other media which is capable of storing magnetic code.

Appropriate efforts shall be made to minimize the disclosure of records and other information which are not the subject of this warrant.

All of which constitute fruits, evidence and/ or instrumentalities of violations of Title 18, U. S. Code, Sections 1956, 1957, 2315, and 2341 et seq.

# United States District Court

## *DISTRICT OF DELAWARE*

In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

Storage Unit 216
100 Hickman Road
Claymont DE 19810
As more particularly described
in Attachment A

: 
:
: CASE NUMBER: 08- 33-M
:
:
:
:

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

## SEALED

I, <u>William Campbell,</u>, being duly sworn depose and say:

I am a(n) <u>Special Agent Bureau of Alcohol, Tobacco, Firearms, and Explosives</u> and have reason to believe that

_____ on the person of or  <u>x</u>  on the property or premises known as  (name, description and/or location)

<u>See</u> Attachment A, which is incorporated herein by reference,

in the _____ District of _____ **Delaware** _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

<u>See</u> Attachment B, which is incorporated herein by reference,

**which is** (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rule of Criminal Procedure)

property that constitutes evidence of the commission of a criminal offense, the fruits of crime and things criminally possessed and property designed and intended for use and which has been used as a means of committing a criminal offense concerning violations of 18 U.S.C. Sections 2342, 371, and 1956 and 1957.

The facts to support a finding of Probable Cause are as follows:

See attached affidavit of William Campbell , which is incorporated herein by reference.

Continued on the attached sheets and made a part hereof.   <u>X</u> Yes   ___ No

_____
Signature of Affiant
Special Agent

Sworn to before me, and subscribed in my presence
**February 8, 2008** _____  at  ___ Wilmington, Delaware _____
**Date**                                              City and State

Honorable Leonard P. Stark
United States Magistrate Judge
District of Delaware
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

# United States District Court
## *DISTRICT OF DELAWARE*

In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

| | |
|---|---|
| Storage Units 460, 468, 565 | : |
| Tri-State Self Storage | : |
| 1050 Ridge Road | : |
| Claymont, DE 19703, | : CASE NUMBER: 08- 3|-M |
| As more particularly described | : |
| in Attachment A | : |

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

I, **William Campbell**, being duly sworn depose and say:

I am a(n) **Special Agent Bureau of Alcohol, Tobacco, Firearms, and Explosives** and have reason to believe that

_____ on the person of or __x__ on the property or premises known as (name, description and/or location)

See Attachment A, which is incorporated herein by reference,

in the _____ District of _____**Delaware**_____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B, which is incorporated herein by reference,

**which is** (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rule of Criminal Procedure)

**property that constitutes evidence of the commission of a criminal offense, the fruits of crime and things criminally possessed and property designed and intended for use and which has been used as a means of committing a criminal offense concerning violations of 18 U.S.C. Sections 2342, 371, and 1956 and 1957.**

The facts to support a finding of Probable Cause are as follows:

See attached affidavit of William Campbell , which is incorporated herein by reference.

Continued on the attached sheets and made a part hereof.    __X__ Yes    ____ No

_____
Signature of Affiant
Special Agent

Sworn to before me, and subscribed in my presence

| | | |
|---|---|---|
| **February 7, 2008** | at | **Wilmington, Delaware** |
| Date | | City and State |
| Honorable Leonard P. Stark | | |
| United States Magistrate Judge | | _____ |
| District of Delaware | | Signature of Judicial Officer |
| Name and Title of Judicial Officer | | |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT FOR STORAGE UNITS 460, 468, AND 565 AT TRI-STATE SELF STORAGE, 1050 RIDGE ROAD, CLAYMONT, DE  19703

I, William J. Campbell, (hereinafter "Agent Campbell" or "your affiant") being duly sworn, depose and state that:

### Purpose of the Affidavit

This affidavit is made in support of a search warrant for storage units 460, 468, and 565 located at Tri-State Self Storage, 1050 Ridge Road, Claymont, Delaware 19703, ("the Subject Premises") storage units believed to be occupied/rented by targets Charanjit SINGH, ███████████ (hereinafter "C.SINGH"), and his son, Manjoth SINGH, ████████████ (hereinafter "M.SINGH") both of ██████████████ Wilmington, Delaware 19810.[1]  Through this multi-year investigation, law enforcement officers have learned that C. SINGH, M. SINGH, and C. SINGH's wife, Sunit SINGH, DOB: ██████████████ (hereinafter "S. SINGH") are owners of two Delaware corporations in the business of retail cigarette sales: Raj, Inc. t/a Ridge Tobacco, 315 Ridge Road, Claymont, Delaware  19703 (hereinafter the "Ridge Tobacco Store") and American Cigarette Outlet, Inc., 1401 North DuPont Highway, New Castle, Delaware 19720 (hereinafter "American Cigarette Outlet")[2] which, along with 126 Shrewsbury Drive ("the SINGH residence"), your affiant separately has sought authorization to search.

---

[1]   These Subject Premises are further described in Attachment A to the warrant, incorporated herein by reference. The items to be seized pursuant to this warrant are described in Attachment B, likewise incorporated herein by reference.

[2]   C. and S. SINGH are identified as the owners and corporate officers of the Ridge Tobacco Store on its Delaware business license and registration paperwork. M. and S. SINGH are identified on Delaware license and registration paperwork as the owners and corporate officers of American Cigarette Outlet, which was incorporated in Delaware on February 5, 2007, and began doing business on June 9, 2007.

Between May 11, 2007 and January 11, 2008, C. SINGH and M.SINGH are alleged to have violated 18 U.S.C. Section 2342, the Contraband Cigarette Trafficking Act, through ten separate purchases in Delaware of untaxed contraband cigarettes from undercover officers posing as New York-based cigarette smugglers. C.SINGH and M.SINGH have paid the undercovers over $1.1 million dollars for these contraband cigarettes. As a result of these transactions, C. SINGH and M.SINGH and their businesses have avoided approximately $389,000.00 in Delaware cigarette taxes through the investigation to date.

This investigation is being conducted by the ATF (Camden, New Jersey and Wilmington, Delaware Field Offices) with assistance from the New York State Alcohol Tobacco and Petroleum Bureau and the Delaware Division of Revenue. Your affiant has participated in this investigation and is personally familiar with the facts and circumstances of the offenses described herein and/or has obtained the information provided from meetings and discussions with other law enforcement officers, civilians, or has learned the information provided from public records and/or subpoenaed documents. Your affiant is including within this affidavit sufficient information to support probable cause of violations of 18 U.S.C. Section 2342 for the requested search warrant for the Subject Premises. Your affiant is not detailing all of his knowledge about the targets, the facts and circumstances under investigation, or the information revealed by this investigation, but rather facts necessary to establish probable cause that evidence of violations of Section 2342, 371, and/or 1956/57 will be located at the Subject Premises.

## Affiant's Background

Your affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, ("ATF"), United States Department of Justice, and has been so employed since November, 1987.

Your Affiant is a graduate of the Criminal Investigators Training Program conducted at the Federal Law Enforcement Training Center and the ATF National Academy. Your affiant has attended several courses and seminars regarding alcohol and tobacco

2

diversion, money laundering, complex investigations and advanced financial investigations.

During your affiant's employment with the ATF, your affiant has conducted narcotics, firearms, and arson for profit investigations that have involved large-scale conspiracies. By conducting these types of investigations, your affiant has obtained knowledge to recognize the methods used by cigarette and firearms traffickers and others disposed to commit criminal offenses to conceal their criminal activities from law enforcement personnel and others.

As a result of your affiant's training and experience, your affiant is familiar with federal criminal laws relating to contraband cigarette trafficking, conspiracy, and money laundering. As a law enforcement officer, your affiant has participated in numerous arrests and search warrants for various violations of state and federal law. In addition to this experience, your affiant has conducted investigations involving the illegal sale and diversion of cigarettes.

Based on your affiant's training, experience and participation in other financial investigations of illegal activities, especially those involving money laundering, illegal cigarette/counterfeit stamp sales, and contraband cigarette trafficking, your affiant knows the following facts:

    a.  Individuals involved in illegal activities for profit often purchase and or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to conceal these assets from law enforcement or regulatory agencies.

    b.  Individuals can profit in contraband cigarette trafficking and/or the illegal sale or "diversion" of cigarettes by obtaining untaxed cigarettes and then illegally distributing them for a substantial profit. Individuals involved in these types of illegal cigarette activities for profit are required to conduct large financial transactions to purchase and sell the contraband cigarettes. Often times, the individuals or businesses involved in the sale of contraband cigarettes maintain numerous bank accounts in order that the

3

funds generated can be deposited into the accounts by various means, electronically or in person.

c.  It is common for individuals involved in the sale of cigarettes, whether legal or illegal, to maintain books, records, receipts, notes, ledgers, and other papers relating to the order, transportation, sale, and distribution of goods and materials, including the cigarettes themselves; that these aforementioned records and documents are often maintained where the individuals live or, in the case of a business entity, a location readily accessible to those individuals, in the case of a business operation, this is often on the business premises.

d.  Individuals involved in illegal cigarette/stamp sales and/or contraband cigarette trafficking commonly maintain addresses and telephone numbers of their associates as well as photographs of themselves, their associates, and their assets. Such information and photographs are commonly maintained within the residences, businesses, vehicles, and/or other locations controlled by those engaged in the illegal cigarette sales and/or contraband cigarette trafficking.

e.  Individuals involved in contraband cigarette trafficking generate various types of records and documents which are of a permanent nature, and which must be maintained to facilitate and continue their crime. This information (records of illegal transactions) typically must be readily accessible; therefore, such information is commonly maintained and retained within the residences, businesses, vehicles, and/or other locations under the control of the individuals involved in the illegal cigarette sales.

f.  Individuals or businesses involved in contraband cigarette trafficking for profit often utilize electronic equipment, including computers, facsimile machines, currency counting machines, telephone answering machines, pagers, cellular telephones, PDAs and the like in their illicit trade.  The aforementioned equipment often stores information relative to the illegal cigarette sales and is often maintained within the residences, businesses, vehicles, and/or other locations controlled by those engaged in the illegal cigarette/counterfeit stamp sales and/or contraband cigarette trafficking.

Your Affiant alleges that the facts outlined below demonstrate probable cause to issue search warrant for the Subject Premises, further described in Attachment A.

Your affiant has reason to believe that, if the requested search warrant is granted, there will be found items, specifically identified in Attachment B to the warrant, which will reflect and document the following criminal offenses, including Title 18, U.S.C. Section 2342, the contraband cigarette trafficking act and Title 18, U.S.C. Section 371,

4

conspiracy, including conspiracy to violate 18 U.S.C. Section 2342 and 18 U.S.C. Section 1956/57 (money laundering). Your affiant further believes that these items will include property that constitutes evidence of these offenses, the fruits of these crimes, and things criminally possessed and property designed and intended for use, and which has been used, as a means of committing these offenses.

Your affiant bases these conclusions upon the following information:

### Background: Core Concepts for Understanding Contraband Cigarette Trafficking

A "cigarette" is defined in 18 U.S.C. § 2341(1) as "(A) any roll of tobacco wrapped in paper, or in any substance not containing tobacco; and (B) any roll of tobacco wrapped in any substance containing tobacco which, because of its appearance, the type of tobacco used in its filler, or its packaging and labeling, is likely to be offered to, or purchased by, consumers as a cigarette." Domestic cigarettes are normally packaged in packs; each pack usually contains twenty or twenty-five sticks of cigarettes. There are normally ten packs of twenty cigarettes to a carton. A carton is the largest unit provided for retail sale. Cartons are packaged either in half cases or "master" cases, known in the industry as "6M" and "12M" cases, respectively. A 6M case contains 6,000 individual cigarette sticks; a 12M case contains 12,000 individual cigarette sticks.

Your affiant knows that every state in the United States imposes some tax (within a wide range) on the retail sale of cigarettes. The liability for these state taxes generally arises once the cigarettes enter the jurisdiction of the state. Delaware, like all but two of these states, requires indicia of the cigarette tax to be affixed on each individual unit (pack) of cigarettes via a state tax stamp or imprint to demonstrate that the state tax has been paid. Only cigarettes stamped with a Delaware tax stamp are permitted to be sold in Delaware to retail customers; cigarettes bearing stamps from any other state are contraband. In Delaware, your affiant is aware that certain out-of-state wholesale distributors are licensed as the state's cigarette stamping agents. As such, they are generally responsible for the payment of the state tax and for affixing the tax stamp on each individual pack of cigarettes prior to delivery to retail dealers, such as the targets of this investigation. When this investigation began, Delaware's cigarette tax was $0.55 per pack. On August 1,

5

2007, Delaware increased its cigarette tax to $1.15 a pack. Even with the increase in price, Delaware's cigarette tax remains substantially lower than the tax levied on cigarettes by the states of New Jersey or New York.

The term "contraband cigarettes" as defined in 18 U.S.C. § 2341(2), means "a quantity in excess of 10,000 cigarettes which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if (as everywhere except North Carolina, North Dakota, Native American reservations and certain military installations) the State or local government requires [a tax stamp or indicia of tax payment] to be placed on the packages or other containers of cigarettes to evidence payment of cigarette taxes. . . ." Subject to narrow, specific exemptions, all cigarettes possessed by anyone in Delaware other than a licensed Delaware stamping agent must have Delaware tax stamp affixed to each pack of cigarettes in their possession, thereby demonstrating that the state's or locality's cigarette tax has been properly paid by the stamping agent.

Your affiant is aware that illegal interstate trafficking in untaxed cigarettes deprives the states of millions of dollars in cigarette tax revenues. Recognizing that the range in state cigarette taxes creates a potential for interstate trafficking in cigarettes to avoid (a higher) state tax, the United States Congress enacted the Contraband Cigarette Trafficking Act, Title 18, United States Code, Section 2341 et seq., making it unlawful for any person, other than an "exempt person," described below, to ship, transport, receive, possess, sell, distribute, or purchase "contraband cigarettes" as previously defined.[3]

As described below, the cigarettes purchased by C. SINGH and M. SINGH throughout this investigation did not have Delaware tax stamps on them. Moreover, your affiant has confirmed that neither C. SINGH, M. SINGH, nor their businesses, the Ridge Tobacco

---

[3] An exempt person is classified generally as a cigarette manufacturer, export warehouse proprietor, customs bonded warehouse, common carrier, political subdivision, foreign trade zone, and/or licensed distributor authorized to account for and to pay the state-imposed tax and in compliance with all accounting and payment requirements.

6

Store or American Cigarette Outlet have been a licensed cigarette stamping agent in Delaware during the period under investigation. Instead, targets C. SINGH and M.SINGH (and their businesses) were and are retail distributors who can legally purchase stamped (taxed) cigarettes only from certain wholesale distributors functioning as Delaware's stamping agents. As such, it is a violation of federal and Delaware law[4] for the targets or their businesses to be in possession of untaxed (unstamped) cigarettes, as defined above.

Like many states, Delaware sets minimum wholesale per carton prices for cigarette sales to retailers. (Delaware has no minimum retail price; however, the minimum wholesale price obviously affects the retailers' ability to profit from the sale of cigarettes sold below that price.[5]) To assist retailers, cigarette manufacturers offer retailers "promotional payments" commonly referred to in the industry as "buy down programs" on particular brands of cigarettes. The buy down programs are designed to increase the sale of certain cigarettes at retail stores by reducing a retailer's cost over a defined period of time. These payments allow the retailer to pass some of this savings along to their customers, by selling those products closer to the wholesale price they paid for the cigarettes. These promotional payments can account for as much as 80% of profit on a carton of cigarettes.

By way of example, at present, Lorillard Tobacco Co. ("Lorillard"), the manufacturer of Newport cigarettes, offers Delaware retailers a buy-down of approximately $6.50 per carton. Through this investigation, your affiant has become aware that, during the 2007 calendar year, the Ridge Tobacco Store did not participate in buy-down programs provided by the three major cigarette manufacturers, Philip Morris USA ("Philip Morris),

---

[4] *See* Delaware Code, Title 30, Section 5242 (2007).

[5] Your affiant is aware that the profit margin for cigarette sales is small, often approximating $1.00 per carton. Many retailers, such as convenience stores and gas stations, can increase profits by selling their cigarettes at higher per pack prices to consumers who purchase one or two packs at a time from them. By contrast, "cigarette outlet" retailers, such as the targets of this investigation, whose primary products are cigarettes and tobacco products, must sell their cigarettes at a very small profit margin in order to retain their customers.

7

Lorillard, and R.J. Reynolds Tobacco Co. ("R.J. Reynolds"). (It appears that C.SINGH has and does participate in buy-down programs with Leggett and Commonwealth.) Representatives of Lorillard explained that they stopped doing business with Ridge Tobacco several years ago due to C. SINGH's refusal to follow the requirements of Lorillard's promotional buy-down programs.[6]

### Investigation: 2004-2005

In approximately September 2004, as part of an investigation into contraband cigarettes and counterfeit cigarette tax stamp trafficking in Delaware, Pennsylvania, New Jersey and New York, your affiant learned that a confidential informant (hereinafter "CI -001") had been identified by ATF Camden as knowledgeable in the distribution of untaxed cigarettes. CI-001 reported that he/she had access to individuals in Delaware who were selling counterfeit cigarette tax stamps and engaging in illegal cigarette trafficking. The CI likewise informed the ATF that he/she had been selling up to 2,000 cartons per week of what were believed to be stamped cigarettes to an individual known to the CI as "Raj," telephone number ███████████, who drove a black Toyota Highlander bearing Delaware registration ██████████ registered to Sunit K. SINGH (hereinafter the "Toyota Highlander"). CI-001 described Raj as a male of Middle-Eastern descent, in his early 20s, with a beard.

CI-001 related that Raj told him/her that Raj was involved in removing the Delaware tax stamps from the cigarettes he was purchasing from CI-001 and replacing them with counterfeit New Jersey cigarette tax stamps. Subsequent investigation identified Raj as Manjoth SINGH, ████████████, Wilmington, Delaware 19810 ("M. SINGH"). The telephone subscriber information for telephone number ████████ then and

---

[6] Because the Ridge Tobacco Store does not participate in the major manufacturer's buy down programs, it cannot legitimately sell its cigarettes for less than cost (the minimum wholesale price) without incurring losses on every sale. As described in more detail below, on January 30, 2008, an ATF agent, acting in an undercover capacity, purchased a carton of Newport Box 100's from the Ridge Tobacco Store for $36.59. This price is less than the legitimate minimum wholesale price for the cigarettes in Delaware and, if the cigarettes sold were not purchased through contraband cigarette trafficking, would actually result in a loss of $3.88 per carton to the store.

8

now comes back to Charanjit SINGH, █████████████████ ington, Delaware
19810 ("C. SINGH"). Subsequent investigation determined that C. SINGH was M.
SINGH's father. Telephone number ███████████ was already known to ATF Camden
through subpoenaed telephone records as being a telephone number called by a target of
an ATF contraband cigarette investigation.

In March 2005, while conducting surveillance of a Pennsylvania resident who was a
target of an ATF contraband cigarette investigation, and who is hereinafter identified as
CI-002, the target was seen parking his/her vehicle in the driveway of ██████████████
██████ the SINGH residence, receiving what appeared to be three cases of cigarettes.

In August 2005, CI-001 contacted ATF Camden and advised that C. SINGH approached
CI-001 and introduced himself as "Tony," Raj's father. CI-001 indicated that Tony
asked if CI-001 could sell Tony as much SKOAL (smokeless tobacco) as the CI could
supply. C. SINGH told CI-001 that he could sell SKOAL at his 7-11 store in New York.
Tony provided CI-001 his cellular telephone number ███████████ C. SINGH has
used this telephone number throughout this investigation; it is subscribed to by his
daughter, Mandeep SINGH, ██████████████████ Wilmington,
Delaware 19810.

In October 2005, a previous target and later CI (hereinafter "CI-002") was questioned
regarding, among other things, his/her dealings with M. SINGH and C. SINGH. CI-002
said that he/she purchased cigarettes from Tony and Raj, Tony's son. He/she purchased
cigarettes with Delaware tax stamps from Tony at the Ridge Tobacco Store for the
purpose of reselling the cigarettes (affixed with new counterfeit stamps) in Pennsylvania
and New York, states with higher cigarette taxes. He/she also stated that he/she
purchased Delaware-stamped cigarettes from Raj at his house, where he stored the
cigarettes in his garage. Indeed, CI-002 said that on one occasion he/she observed
unstamped cigarettes in Raj's garage.

### Churning Authority – May 2006

On December 8, 2004, ATF was granted legal "churning authority" permitting the agency, with respect to any undercover investigative operation necessary for the detection and prosecution of crimes against the United States, do the following:

- (A) use appropriated sums to purchase property, buildings, and other facilities, and for leasing space, within the United States, the District of Columbia, and the territories and possession of the United States;
- (B) use appropriated sums to establish or to acquire proprietary corporations entities as part of an undercover investigative operation, and to operate such corporations or business entities on a commercial basis;
- (C) deposit appropriated sums and the proceeds from such undercover operation, in banks or other financial institutions, without regard to section 648 of Title 18 of the United States Code and section 3302 of Title 31 of the United States Code; and
- (D) use proceeds from such undercover operation to offset necessary and reasonable expenses incurred in such operation.

On May 10, 2006, Agent Campbell received authority to open up a churning account for use in undercover operations in connection with this investigation. Accordingly, Agent Campbell opened account number ███████ with Commerce Bank (hereinafter the "Commerce Bank Churning Account") on October 2, 2006.

### Investigation 2007 – The Contraband Cigarette Deals

In summary, from May 11, 2007 through January 11, 2008, C. SINGH and M.SINGH purchased approximately 40,000 cartons of unstamped contraband cigarettes through this undercover investigation. C. and M. SINGH have paid approximately $1.1 million in cash to undercover officers for these cigarettes. All profits from these sales were redeposited into the Commerce Bank Churning Account. On every occasion, the sales price for the contraband cigarettes has been below Delaware's minimum lawful wholesale price. These deals are described as follows to establish sufficient probable cause to believe that evidence, fruits or instrumentalities of violations of 18 U.S.C.

10

Section 2341 *et seq.*, and/or 18 U.S.C. Section 371 and/or 18 U.S.C. Section 1956/57 will be located within the Subject Premises your affiant seeks authority to search.

On May 2, 2007, at approximately 2:00 p.m., ATF Special Agent William Campbell recorded a telephone call from CI-002 to M. SINGH at telephone number ██████████ During that call, CI-002 told M. SINGH that he/she had a source for Newport and Marlboro cigarettes and that the source could sell Newports at $28.00 per carton and Marlboros at $27.50 per carton. This call was made from ATF's Camden Field Office; CI-002 left shortly after the call was made. After CI-002 left, at around 2:15 p.m., CI-002 called New York State Department of Taxation & Finance Investigator Steve Rivera (hereinafter "Investigator Rivera"). Investigator Rivera previously had been working with ATF on this investigation and was familiar with CI-002. During that call, CI-002 told Rivera that Raj just telephoned him/her, indicated that he had spoken with his (Raj's) father, and explained that his father was interested in purchasing the offered cigarettes but at a lower price: $27.00 per carton for both brands.

On May 3, 2007, CI -002 met with Sunit SINGH ("S. SINGH") at the Ridge Tobacco Store. The meeting was not recorded. This investigation has determined that S. SINGH is C.SINGH's wife and M.SINGH's mother; she is also a co-owner of both the Ridge Tobacco Store and the American Cigarette Outlet. At the conclusion of this meeting, Agent Campbell and Investigator Rivera met with CI-002, who provided the following information. S.SINGH told CI-002 that neither Raj (M. SINGH) nor Tony (C. SINGH) were present at the Ridge Tobacco Store at the time of the meeting. Nevertheless, according to CI-002, S. SINGH advised him/her that Tony would be interested in purchasing 1000-2000 cartons of cigarettes from CI-002 on a regular basis. S. SINGH then called Tony and handed the phone to CI-002. According to CI-002, Tony was interested in purchasing cigarettes from CI-002's source for $27.00 per carton for the Newports and $27.50 for the Marlboros. CI-002 said Tony told him/her to contact Raj when the cigarettes became available.

## DEAL 1   MAY 11, 2007

On May 7, 2007, CI-002 contacted M. SINGH and arranged the sale of cigarettes from undercover Investigator Rivera, aka "Teo." M. SINGH ordered 1,000 cartons of Newports, 840 cartons of Marlboros. The agreed-upon price for these cigarettes was $27.00 per carton. As was the case with all subsequent cigarette purchases between Investigator Rivera and M. and C. SINGH, this price was below the Delaware legal minimum wholesale price for these cigarettes brands at the time. Additionally, CI-002 is not and did not represent herself as a licensed cigarette wholesaler.

Arrangements were set for delivery on May 11, 2007. On May 10, 2007, CI-002 contacted M. SINGH, who requested to meet CI-002 on May 11, 2007 at 12:30 p.m. Agent Campbell was able to purchase 1,080 cartons of Newports utilizing funds from the Commerce Bank Churning Account; he was not able to purchase the requested Marlboro cigarettes. Because the Newports were delivered from the manufacturer, the packs bore no state tax stamps. Once he took delivery of the cigarettes, Agent Campbell opened a random case and photographed a random pack of cigarettes for the purpose of demonstrating the lack of a tax stamp on the packs.

At approximately 12:44 p.m. on May 11, 2007, CI -002 placed a telephone call to M.SINGH, who advised CI-002 to travel to the WaWa store at the corner of Naamans Road and Ridge Road, Claymont, Delaware located near the Ridge Tobacco Store (hereinafter "the WaWa Store") M. SINGH was to meet CI-002 and Investigator Rivera, posing undercover as his/her cigarette supplier. Rivera and the CI were traveling in a rented cargo van loaded with the contraband cigarettes. Rivera was fitted with a transmitter prior to the meeting with M. SINGH.

At approximately 1:25 p.m., Agent Campbell and another agent observed Investigator Rivera following a silver Infiniti G35, Delaware license number ███ registered to Charanjit and Manjoth Singh (hereinafter "the Infinity G35") into Tri-State Self Storage, 100 Hickman Road, Claymont, Delaware 19703 (hereinafter "Tri-State Storage-Hickman"). Rivera's cargo van was traveling between the Infiniti G35 and a white 2004 BMW X-5; Delaware license ███, registered to Charanjit Singh ("the BMW X-

5"). All three cars entered Tri-State Storage-Hickman. At approximately 1:27 p.m., Investigator Rivera advised via the transmitter that he, CI-002, M. SINGH and C. SINGH met together at storage unit E-210.

Information from Tri-State Self Storage indicates that, as of January 8, 2008, Ridge Tobacco, 315 B Ridge Road, Claymont, Delaware 19703 was the renter/occupant of unit E-210.

Via the transmitter, Agent Campbell heard Investigator Rivera in conversation with at least one other male regarding the sale of cigarettes. At approximately 1:50 p.m., Agent Campbell was able to determine the transaction was coming to a close. A few minutes later, Rivera advised that he was departing the storage area. At about 2:00 p.m., Agent Campbell met with Investigator Rivera and CI-002 at a rest area on I-95 where Agent Campbell retrieved the transmitting device and $29,160.00 in cash from Rivera representing the funds M. SINGH and C. SINGH paid for the contraband cigarettes.

Investigator Rivera provided the following information relating to his sale of contraband cigarettes to M. and C. SINGH. M. SINGH provided the name "Frank" to Rivera and opened the gate to Tri-State Storage by entering a code. C. SINGH followed them into the facility in the BMW X-5. Rivera was then led to storage unit E-210, which C. SINGH unlocked and opened. Within unit E-210, Rivera observed approximately 100 to 150 6M cases of USA Gold brand cigarettes.[7] M. SINGH instructed Rivera to back his van to the door of E-210. C. SINGH then opened a case of the unstamped contraband cigarettes provided by Rivera and examined them to verify that the cigarettes were legitimate Philip Morris Marlboros and not counterfeit product. C. SINGH told M. SINGH to get the money to pay for the cigarettes, and M. SINGH went to one of the vehicles and returned carrying money. C.SINGH began counting the money, as did Rivera and CI-002. The cash totaled $29,160.00. This cash was subsequently deposited into the Commerce Bank Churning Account.

---

[7]  In general, when a stamping agent stamps cigarettes from the manufacturer, the cases must be cut in half for the purpose of removing cartons and running the packs through the stamping machine. Those cigarettes are then re-packaged in half cases.

## DEAL 2  MAY 24, 2007

On May 17, 2007, Investigator Rivera called M. SINGH at telephone number █████ █ and received an order for 1,380 cartons of Newports from M. SINGH. M. SINGH also requested Marlboros at this time as well. Previously, M. SINGH and Investigator Rivera had agreed upon a price of $27.00 per carton.

On May 23, 2007, Agent Campbell ordered 1,380 cartons of Newports from Lorillard, wiring $32,761.20 from the Commerce Bank Churning Account to pay for the cigarettes. Agent Campbell took delivery of the cigarettes on May 24, 2007. Because these cigarettes were delivered from the manufacturer, the packs bore no state tax stamps. Campbell photographed the untaxed cigarettes and loaded them into the undercover van. That same day, Investigator Rivera was provided with an audio recorder and a transmitter and, at approximately 1:43 p.m. he arrived at the WaWa Store and telephoned M. SINGH.

At approximately 2:04 p.m., Agent Campbell observed M. SINGH arriving at the WaWa Store in the Infiniti G-35; however, Agent Campbell's view was obstructed and he could not see Investigator Rivera and M. SINGH drive away from the parking lot. Investigator Rivera could be heard via the transmitter indicating he was inside the premises of Tri-State Storage-Hickman. At some point during the meeting, C. SINGH arrived on location in a 2004 Toyota Highlander, Delaware license █████ registered to Sunit K. Singh ("the Toyota Highlander") and joined the discussion with Investigator Rivera. At about 2:26 p.m., M. SINGH departed the storage area. Thereafter, at approximately 2:35 p.m., Agent Campbell observed both Investigator Rivera and C. SINGH driving south on Hickman Road. Agent Campbell followed Investigator Rivera's cargo van to a rest stop on I-95 where he met with Rivera and retrieved the recording and transmitting devices and $37,260 in cash. This currency subsequently was deposited into the Commerce Bank Churning Account.

Rivera explained that the contraband cigarettes were loaded into storage unit E-210, where he also observed approximately 200 cases of USA Golds and two master cases of

Newports. Investigator Rivera also observed M. SINGH retrieve the money for the deal from the Infiniti G35.

### DEAL 3   JUNE 1, 2007

On May 25, 2007, at approximately 3:05 p.m., Agent Campbell recorded a call from Investigator Rivera to M. SINGH at telephone number ███████████ M. SINGH placed an order for 1,400 cartons of Marlboros and 1,380 cartons of Newports, agreeing to a delivery at the end of the following week.

On May 29, 2007, Agent Campbell placed an order for cigarettes thru Molokai Alexander, ATF Tobacco Branch, for 1,440 cartons of Marlboros from Philip Morris and 840 cartons of Newports from Lorillard. The balance in the Commerce Bank Churning Account was insufficient to pay for M. SINGH's entire order.

On June 1, 2007, Agent Campbell took delivery of the 2,280 cartons of unstamped Newports and Marlboros. Because these cigarettes were delivered from the manufacturers, the packs bore no state tax stamps. Campbell opened a random carton, photographed the cigarettes to show they were unstamped, and loaded them into the undercover cargo van. On the same day, at approximately 1:05 p.m., Investigator Rivera telephoned M. SINGH at telephone number ███████████ and told M. SINGH that he would meet him in about one and one-half hours. Investigator Rivera was then provided with recording and transmitting devices. At approximately 3:00 p.m., ATF personnel took up surveillance positions near Tri-State Storage-Hickman. Shortly thereafter, Investigator Rivera arrived at the WaWa Store parking lot and telephoned M. SINGH to let him know he was waiting.

At about 3:36 p.m., M. SINGH arrived at the WaWa Store driving the Infiniti G-35, and Rivera followed M. SINGH to Tri-State Storage-Hickman. Agent Campbell observed Investigator Rivera follow M. SINGH inside of the facility. Investigator Rivera announced via the transmitter that he followed M. SINGH to a new storage unit, number E-265.

Information from Tri-State Self Storage indicates that, as of January 8, 2008, Manjoth Singh, 126 Shrewsbury Drive, Wilmington, DE 19810 was the renter/occupant of unit number E-265.

Surveillance units could hear Investigator Rivera and M. SINGH discussing the cigarettes and counting money. At about 4:26 p.m., Investigator Rivera and M. SINGH departed the storage facility. Surveillance was broken off at this time, and Agent Campbell followed Investigator Rivera to ATF Camden where Agent Campbell retrieved the recording and transmitting devices and $61,560.00 in cash from Investigator Rivera representing the cash paid by M. SINGH for the unstamped cigarettes. These funds were subsequently deposited into the Commerce Bank Churning Account.

### DEAL 4   June 21, 2007

On June 18, 2007, M. SINGH called Investigator Rivera and ordered 1,200 cartons of Newport cigarettes and 1,500 of Marlboros to be delivered for $27.00 per carton. Rivera advised M. SINGH he could deliver the cigarettes later in the week. That same day, Agent Campbell wire transferred $17,999.75 from the Commerce Bank Churning Account to Philip Morris and $28,488.00 to Lorillard to pay for the untaxed cigarettes ordered by M. SINGH.

On June 21, 2007, Agent Campbell took possession of the unstamped Marlboros and Newports and they were loaded into the undercover cargo van. Because the cigarettes were delivered from the manufacturer, the packs bore no state tax stamps. A sample carton of both the Newports and Marlboros was photographed to show this lack of a tax stamp. At approximately 12:32 p.m. on that day, Investigator Rivera called M. SINGH at telephone number ███████ and left a message for "Frank" to return his call. About a half-hour later, Investigator Rivera called M. SINGH again, told him the requested cigarettes were available, and indicated that they could meet around 2:30 p.m. While M. SINGH had not been expecting Rivera until the next day, SINGH was willing to do the deal anyway.

At approximately 2:15 p.m., Agent Campbell provided Investigator Rivera with a transmitter and a recording device, and he arrived at the WaWa Store and placed a call to

M. SINGH at around 2:48 p.m. According to Rivera, M. SINGH told him he would be there in five minutes. At approximately 3:00 p.m., M. SINGH called Rivera and told him his (Singh's) father would meet Rivera instead, arriving in about twenty minutes.

At about 3:45 p.m., C. SINGH arrived at the WaWa Store driving the Toyota Highlander. Rivera made contact and followed C. SINGH to Tri-State Self Storage-Hickman where they stayed until approximately 4:40 p.m., during which time Investigator Rivera and C. SINGH unloaded the 2,700 cartons of cigarettes from the undercover cargo van into storage unit E-265 and counted the cash payment. After the meeting, Agent Campbell and another ATF agent followed Rivera directly from Tri-State Storage-Hickman north on I-95 to a rest area. Agent Campbell retrieved the recorder and transmitter and a black travel bag containing $72,900.00 in cash representing C.SINGH's payment to Rivera for the unstamped cigarettes. These funds were deposited into the Commerce Bank Churning Account.

## DEAL 5   JULY 13, 2007

On July 4, 2007, C. SINGH called Investigator Rivera and placed an order for 2,100 cartons of Newports and 600 cartons of Philip Morris brand cigarettes, agreeing again to pay Rivera $27.00. On July 8, 2007, Investigator Rivera received a message from "Frank," (M. SINGH) regarding this order.

On July 10, 2007, Agent Campbell purchased 2,100 cartons of unstamped Newports from Lorillard for $49,854.00 and 600 cartons of cigarettes from Philip Morris for $7,199.90, wire transferring payment for the cigarettes from the Commerce Bank Churning Account.

On July 11, 2007, C. SINGH called Investigator Rivera and left a message expressing his interest in meeting with Rivera in New York because C. SINGH was then in Long Island. Later that same day, C. SINGH called Rivera again and left a message requesting delivery of the previously ordered 2,700 cartons on July 14 or 15, 2007. Because the requested delivery was on a weekend, Rivera returned C. SINGH's call on July 12th and advised SINGH that he could only deliver the cigarettes on July 13, 2007, a Friday.

17

On July 13, 2007, Agent Campbell took delivery of 600 cartons of Marlboros and 2,100 cartons of Newports which were then photographed and loaded into the cargo van. Because these cigarettes were delivered from the manufacturers, the packs bore no state tax stamps. At approximately 3:15 p.m., Agent Campbell provided Investigator Rivera with a transmitter and a recorder. At 3:40 p.m., Investigator Rivera called C. SINGH and informed C. SINGH he was on his way and would soon be in the area of the Wawa Store.

At about 4:00 p.m., surveillance teams were in position near Tri-State Storage-Hickman. C. SINGH arrived at the WaWa Store at about 4:15 p.m. in the Toyota Highlander. Investigator Rivera followed C. SINGH to Tri-State Storage-Hickman. After approximately one-half hour, Investigator Rivera called Agent Campbell to advise that he was following C. SINGH to another location to count the money from the sale of the untaxed cigarettes. Mobile surveillance was maintained as the two vehicles turned onto Naamans Road. Rivera indicated via the transmitter that he was turning into the driveway at ███████████████ Wilmington, Delaware 19810 and instructed surveillance vehicles not to follow. Accordingly, surveillance units set up in the area nearby.

At approximately 5:21 p.m., Agent Campbell observed Rivera's undercover cargo van following the Toyota Highlander onto Naamans Road after exiting the driveway of ███████████. Investigators followed the undercover van to a rest stop on northbound I-95 where Agent Campbell retrieved a black bag containing $72,900.00 in cash representing C. SINGH's payment to Rivera for the contraband cigarettes. Those funds were subsequently deposited into the Commerce Bank Churning Account.

Investigator Rivera explained that the untaxed cigarettes purchased in this deal were unloaded from the cargo van into unit number E-265 at Tri-State Storage-Hickman. Rivera said that C. SINGH told him he owned a 7-11 store in New York and that a number of individuals from New York travel to Delaware and purchase cigarettes from C. SINGH. C. SINGH recommended to Rivera that he rent a bus to carry cigarettes;

noting that a bus could hold approximately 300 cases. C.SINGH also indicated that he would buy 300 cases (18,000 cartons) per month from Rivera in the future.

Rivera further explained that the cash payment for this contraband cigarette deal was counted at a house owned by C. SINGH located at ███████████████ C. SINGH explained to Rivera that he bought the property with cash at a sheriff's sale for $340,000, but claimed its current value was $3.6 million. (C. SINGH allegedly is building another home on the property at ███████████████; this house is in poor condition.) C. SINGH further explained that he had workers living in the house rent free because they worked for him 12 hours a day. Investigator Rivera verified the $72,900 cash payment for the contraband cigarettes through a money counting machine located in the kitchen of the house at ███████████████

### DEAL 6   August 21, 2007

On July 23, 2007, C. SINGH called Investigator Rivera to order 2,700 cartons of Philip Morris and R. J. Reynolds cigarettes. On August 1, 2007, Agent Campbell ordered the required amount of cigarettes to fill C. SINGH's order from Philip Morris and R.J. Reynolds, respectively, wire transferring $26,189.04 to Philip Morris and, eventually, $1,110.24 to R.J. Reynolds from the Commerce Bank Churning Account to pay for these cigarettes.

On August 12, 2007, Agent Campbell called Investigator Rivera and requested that he call C. SINGH to advise him of the price of the cigarettes, which was increasing on certain brands. As a result of that conversation, the total amount to be received from C. SINGH for the order above was $81,540.00.

On August 21, 2007, at approximately 10:30 a.m., the 2,700 cartons of untaxed cigarettes ordered by C. SINGH were loaded into the undercover cargo van. Because the cigarettes were delivered from the manufacturers, the packs bore no state tax stamps. Prior to loading, Agent Campbell photographed random packs of each brand of cigarette to show the lack of any state tax stamp on the individual packs. At approximately 3:45 p.m., Agent Campbell provided Rivera with transmitting and recording devices. About one-

half hour later, Rivera arrived at the parking lot of the Wawa Store. At this time Agent Campbell instructed Rivera to call C. SINGH, who was already in the Wawa Store parking lot in the BMW X5. Via the transmitter, Rivera could be heard talking with C. SINGH, and then Agent Campbell watched Rivera follow C. SINGH to Tri-State Self Storage-Hickman.

From approximately 4:24 p.m. until about 5:45 p.m., Rivera and C. SINGH remained inside Tri-State Storage-Hickman. At about 5:45 p.m., C. SINGH left the storage area with Rivera following in his undercover van. Rivera advised that C. SINGH was now traveling to get a copy of an invoice to show Rivera to prove the price of the Virginia Slims because they had disagreed about the price for this brand. At about 5:49 p.m., Investigator Rivera arrived back at the WaWa Store to wait for C. SINGH. At about 6:15 p.m., Agent Campbell observed C. SINGH arrive at the WaWa Store parking lot, park the BMW X5 next to Rivera's undercover van, and hand Rivera paperwork through the window, which Rivera accepted and which River later turned over, explaining they were two copies of wholesaler invoices for Virginia Slims, with the wholesaler's name whited out, and a handwritten note from C. SINGH. Agent Campbell was able to determine that the invoices were from the American Cigarette Outlet.

At about 6:20 p.m., C. SINGH left the area. Rivera left shortly thereafter and traveled to a pre-arranged location, followed by Agent Campbell and another. At about 6:30 p.m., Agent Campbell met with Rivera and retrieved the recorder, transmitter, and $80,000.00 in cash representing C. SINGH's payment for the untaxed cigarettes. Those funds were subsequently deposited into the Commerce Bank Churning Account. Rivera reported that he and C. SINGH unloaded cases of untaxed cigarettes into storage unit numbers E-265 and E-210, and that he saw several cases of Wild Horses brand cigarettes (a brand not sold by Investigator Rivera) within unit E-265. The money for this deal ($80,000 of the previously negotiated $81,540) was counted, using a money counter, within unit E-265 after the cigarettes were unloaded.

Rivera further reported that, while at Tri-State Storage-Hickman, C.SINGH explained that he sold his untaxed cigarettes to individuals from New York, but he kept his cigarette

businesses in Delaware and Long Island, New York legitimate. C.SINGH discussed gradually increasing the volume of untaxed cigarettes he bought from Rivera. During the deal, Investigator Rivera reminded C.SINGH that this transaction was not through legitimate channels so he could not compare prices with the wholesaler invoices provided.

### DEAL 7  August 30, 2007

On August 6, 2007, Investigator Rivera and C.SINGH had a further discussion about Rivera's price increases. Investigator Rivera explained that added risks and Delaware's price increase (a tax increase per pack from $.55 to $1.15 that went into effect August 1, 2007) would affect his price. The men continued to negotiate on price. On August 28, 2007, Investigator Rivera called C. SINGH and received an order for 2,700 cartons of Newports for delivery on August 30 or 31, 2007. The agreed-upon price was $29.00 per carton plus the $1,540 discrepancy from the prior deal.

On August 28, 2007, AGENT Campbell purchased 2,700 cartons of unstamped Newports from Lorillard, and wire transferred $64,098.00 from the Commerce Bank Churning Account to pay for them. On August 30, 2007, Campbell took delivery of the unstamped Newports, loaded them into the undercover cargo van, opened a random carton to verify that there were no state tax stamps affixed to the packs and photographed the cigarettes. At approximately 2:00 p.m. that same day, Agent Campbell provided Investigator Rivera with transmitter and recording devices. Approximately one-half hour later, Rivera arrived at the WaWa Store parking lot and called C. SINGH. At approximately 2:45 p.m., Rivera advised that C. SINGH had arrived in the Toyota Highlander and that Rivera was following him to Tri-State Storage-Hickman. Via the transmitter, Rivera advised that he and C.SINGH were in front of storage unit E-265.

For about the next hour, Rivera and C. SINGH could be heard in conversation regarding the sale of cigarettes and both could be heard counting cash. Thereafter, at about 3:42 p.m., C. SINGH and Rivera departed Tri-State Storage-Hickman in their separate vehicles. ATF agents followed C. SINGH back to his residence at ███████████████ and observed him entering the home. Other ATF personnel followed Rivera directly

from Tri-State Storage-Hickman to a pre-arranged meeting location. At approximately 4:00 p.m., Agent Campbell met with Rivera and retrieved the transmitting and recording equipment. Investigator Rivera also provided Agent Campbell with a handwritten order for additional cigarettes from C. SINGH and a plastic "Aloha Hawaii" bag containing $79,840.00 in cash, which represented C. SINGH's payment for the contraband cigarettes. Agent Campbell deposited these funds into the Commerce Bank Churning Account.

Investigator Rivera reported that C.SINGH explained more about his contraband cigarette trafficking business during the August 30, 2007, deal, including, but not limited to, the following information: (1) C. SINGH indicated that he had a steady stream of smugglers from New York as customers and that he had been smuggling cigarettes for eleven years and using the same storage units for eight years. SINGH told his smuggler customers that prices were going to increase in response to his discussion with Rivera on the prior deal. While at one time he used fifteen suppliers, C. SINGH was now down to four (including Rivera); (2) C. SINGH claimed that none of the cigarettes delivered by Rivera went to his stores because he kept the stores legitimate and that he had about 245,000 cartons worth of legitimate cigarettes. C. SINGH also claimed "Raj's" (his son, M. SINGH)'s business (American Cigarette Outlet) likewise was legitimate[8] and that he (Raj) was selling 3,000 cartons per day; (3) C. SINGH explained that he wanted to build up his business with Investigator Rivera to multiple deliveries per month and cautioned Rivera against traveling through Maryland when transporting contraband cigarettes; (4) With respect to the bag in which the money for the unstamped cigarettes was transported, C. SINGH explained that he recently had traveled to Hawaii for his twenty-fifth wedding anniversary.

---

[8]  As discussed below, these claims were demonstrated to be false through undercover purchases of unstamped cigarettes and cigarettes bearing counterfeit stamps at the Ridge Tobacco Store on December 21, 2007 and January 30, 2008 and at American Cigarette Outlet on January 30, 2008.

### DEAL 8   November 19, 2007

On October 19, 2007, C. SINGH called Investigator Rivera and placed an order for 3,060 cartons of Newports, explaining that he (SINGH) had lots of customers. (Rivera earlier had stalled C. SINGH claiming supplier problems; Rivera continued with this stalling tactic after the October 19, 2007 order was placed.)

On November 8, 2007, Agent Campbell recorded a telephone call from Investigator Rivera to C. SINGH, made in response to a call from SINGH to Rivera the day before. This time, C. SINGH placed a second order (in addition to that from October 19, 2007) for 2,640 cartons of Parliaments and 1,800 cartons of Capris; the negotiated price was $29.00 per carton. The potential purchase of USA Gold brand cigarettes was also discussed.

On November 15, 2007, Agent Campbell wire transferred $31,679.56 to Philip Morris and $74,174.46 to Lorillard from the Commerce Bank Churning Account to pay for the untaxed cigarettes ordered by C.SINGH.  On November 16, 2007, at approximately 1:30 a.m., Rivera telephoned C. SINGH and told him the cigarettes would be delivered November 19, 2007, and that, accordingly, C. SINGH should have $217,500.00 available in cash (7,500 cartons x $29.00 = $217,500.00), specifically requesting $100 bills if possible. C. SINGH indicated he would try.

On November 19, 2007, Agent Campbell rented a delivery truck into which were loaded 2,640 cartons of unstamped Parliaments and 3,060 cartons of unstamped Newports for a total of 5,700 cartons (for a total price of $165,300). Delivery of the Capris was delayed. At approximately 2:45 p.m. that same day, Investigator Rivera called C. SINGH and advised him that he was about 15 minutes away from meeting him at Tri-State Storage-Hickman. Agent Campbell provided Rivera with recording and transmitting devices and, at about 3:30 p.m., Rivera moved the rental truck near the front gate of Tri-State Storage-Hickman to await C. SINGH's arrival. Shortly thereafter, C. SINGH arrived, driving the Toyota Highlander. After a few minutes, Rivera advised via the transmitter that C. SINGH was taking him to a different location.

At about 3:30 p.m., with ATF vehicles providing mobile surveillance, C. SINGH and Rivera traveled to another Tri-State Self Storage facility at nearby 1050 Ridge Road,

Claymont, DE, 19703 (hereinafter "Tri-State Storage-Ridge Road"). Via the transmitter,
Rivera advised that he was following C. SINGH into the storage facility to unit number
460.

Information from Tri-State Self Storage indicates that, as of January 8, 2008, Charanjit
Singh, ▮▮▮▮▮▮▮▮▮▮ Wilmington, Delaware 19810 was the renter/occupant of
unit number 460.

Via the transmitter, Rivera was heard unloading cases of the untaxed cigarettes, talking
about the sale of contraband cigarettes, and counting currency until both men departed
Tri-State Storage-Ridge Road at approximately 5:41 p.m. ATF personnel, including
Agent Campbell, followed Rivera back to the original briefing location; no surveillance
was maintained on C. SINGH after he left Tri-State Storage-Ridge Road. Agent
Campbell retrieved the recording and transmitting devices from Investigator Rivera, as
well as a Coors Light soft-side cooler bag containing $165,300.00 in cash representing C.
SINGH's payment for the cigarette order. Thereafter, on November 20, 2007, Agent
Campbell deposited this cash into the Commerce Bank Churning Account.

Among other things, Investigator Rivera confirmed that when he arrived at unit 460 for
this deal, he saw what appeared to be 50-100 6M cases of USA Gold and Newport
cigarettes already in the unit. C.SINGH claimed to Investigator Rivera that he (SINGH)
sold approximately 90,000 cartons of USA Golds per week. SINGH further indicated his
interest in obtaining USA Golds from Rivera, noting that, in addition to Rivera, he
(SINGH) also obtains contraband cigarettes from a Spanish-speaking supplier named
"Anna" with a good connection in North Carolina.[9] C. SINGH explained that he would
be getting rid of some of the untaxed cigarettes the following morning, before he left with
his wife for Switzerland. Moreover, if Investigator Rivera was able to obtain the
additional requested cigarettes -- Capris that had not been delivered by Rivera -- by the

---

[9]  Your affiant is aware that "Anna" is the target of an ATF cigarette smuggling
investigation based out of the Western District of North Carolina. Undercover sales to
"Anna" have occurred on or about 4/20/07, 11/06/07, 11/16/07, 12/03/07, and 1/22/2008.
These sales total approximately 10,000 cartons.

following day, Rivera was to call "Frank," (son M. SINGH) to do the deal.[10]  Investigator Rivera also noted that he and C.SINGH used SINGH's money counting machine at this meeting as they had previously.  Finally, unlike the other deals, some of the stacks of cash C. SINGH paid to Rivera for the untaxed cigarettes were provided in money wrappers from Delaware National Bank's Branmar Plaza branch in North Wilmington.

The day after this deal, November 20, 2007, ATF agents conducted mobile surveillance of C. SINGH.  At 9:00 a.m., agents saw SINGH leaving ███████████████ in the Toyota Highlander, but then lost sight of him.  At 9:15 a.m., other units found the Toyota Highlander parked at the Ridge Tobacco Store.  About 10 minutes later, C. SINGH was seen leaving the Ridge Tobacco Store and driving to Tri-State Storage-Ridge Road. Eventually, SINGH parked the car in the area of unit 460 and made the first of multiple trips to a storage unit, returning to the car with cigarettes.  On his initial trip, C. SINGH was seen carrying what appeared to be five master cases from a storage unit; on each of the subsequent trips he retrieved 3-4 cartons of cigarettes.  All these cigarettes were placed into the Toyota Highlander.  At around 9:45 a.m., C. SINGH locked a storage unit door and drove out of the facility to the nearby Ridge Tobacco Store where he parked and went inside.  About twenty minutes later, C. SINGH came out of the store, removed all five cases and several single cartons of cigarettes from the Toyota Highlander and entered the store with them.

### DEAL 9   December 20, 2007

On December 11, 2007, Investigator Rivera made a telephone call to C. SINGH, who placed an order for 2,130 cartons of USA Golds (various types), and 2,400 cartons of Newports, for a total order of 4530 cartons.  C. SINGH previously had agreed to pay $29.00 per carton for the Newports, $35.00 per carton for the Capris (originally ordered by C. SINGH for delivery during the November 19, 2007 deal), and $19.00 per carton for

---

[10]  On November 20 and 23, 2007, Investigator Rivera received telephone calls from "Frank," (M. SINGH) about the missing delivery of Capri cigarettes, because his father, C. SINGH, was in Switzerland.  Rivera made excuses for why the cigarettes could not be delivered.

the USA Golds. On this same day, Agent Campbell ordered 2,130 cartons of unstamped USA Gold cigarettes from Big Tobacco Sales, Inc., agreeing to pay $17.50 per carton.

On December 17, 2007, Big Tobacco Sales, Inc. delivered the USA Golds to Agent Campbell; however, only 2,070 cartons were delivered and the invoice total of $36,225.00 reflected this change.

On December 18, 2007, C.SINGH ordered an additional 600 cartons of Newports from Investigator Rivera. On this same day, Investigator Rivera called C. SINGH and informed him that delivery would take place on December 20, 2007. In addition, Investigator Rivera told C. SINGH he (SINGH) would get the delivery even if he had to send someone else.

On December 19, 2007, AGENT Campbell ordered 3,000 cartons of Newports from Lorillard, wiring $72,720.00 from the Commerce Bank Churning Account to pay for them. Because the Newports were delivered from the manufacturer, the packs bore no state tax stamps. Agent Campbell also wired $36,225.00 at this time to Big Tobacco Sales, Inc. for the USA Golds which likewise bore no state tax stamp.

On December 20, 2007, Investigator Rivera called C. SINGH and advised that instead of coming to the deal himself, Rivera was going to send "Ah Cho" to deliver the cigarettes. Ah Cho is identified as undercover ATF Agent Tat Shum.

On December 20, 2007, at approximately 10:45 a.m., ATF agents loaded a rented truck with 2,070 cartons of USA Gold cigarettes, 1,440 cartons of Capris, and 3,000 cartons of Newports, which previously had been delivered to Agent Campbell, and transported these unstamped cigarettes from Camden, New Jersey to Wilmington, Delaware. ATF personnel photographed a random pack of cigarettes within the supply in the van to show the lack of any state tax stamp.

On that same day, at approximately 1:15 p.m., Investigator Rivera called C. SINGH and advised him that "Ah Cho" would meet him (SINGH) in the Taco Bell restaurant parking lot, 609 Naamans Road, Claymont, Delaware, between 2:30-3:00 p.m. After installing audio and video tape recording equipment into the undercover van, ATF personnel provided Agent Shum with a recording device and transmitter as well.

On December 20, 2007, at approximately 2:44 p.m., Agent Shum arrived at the Taco Bell restaurant parking lot in the rental truck and waited for C. SINGH. About ten minutes later, C. SINGH arrived in the Toyota Highlander. Via the transmitter, SINGH could be heard instructing Agent Shum to follow him to another location and C. SINGH and Agent Shum were followed to the Tri-State Storage-Ridge Road. Agent Campbell saw both the Highlander and the rental truck stopped near the office just inside the gate. A few minutes later, Agent Campbell observed Agent Shum following C. SINGH in the rental truck. Agent Shum advised via the transmitter that he followed C. SINGH to unit number 468 and that a Tri-State employee unlocked the unit for C. SINGH. At this point, via the transmitter, Agent Shum and C. SINGH could be heard unloading the cases of cigarettes from the truck.

Information from Tri-State Self Storage-Ridge Road indicates that, as of January 8, 2008, Charanjit Singh, ███████████████, Wilmington, DE 19810 was the renter/occupant of unit number 468.

At approximately 3:45 p.m., the cigarettes had been unloaded from the van and C. SINGH told Agent Shum that he was not comfortable counting the money where they were because of two unknown individuals. Accordingly, the men moved their cars to a different location within the Tri-State Storage-Ridge Road facility.

At about 3:52 p.m., Agent Campbell could hear Agent Shum and C. SINGH begin to count the money within the truck, utilizing a money counter. The videotape recording of this deal shows C. SINGH placing the money counter on the dashboard of the rental truck and then counting the cash in groups of several thousand dollars at a time. At

approximately 4:30 p.m., all of the cash had been counted, the deal was concluded and C. SINGH let Agent Shum out of the Tri-State Storage-Ridge Road facility. SINGH stayed at the storage facility. ATF personnel observed C.SINGH return to the approximate area within the storage facility where he and Agent Shum had unloaded the cigarettes into unit 468. At approximately 4:40 p.m., Agent Campbell observed C. SINGH leave Tri-State Storage-Ridge Road in the Toyota Highlander, travel directly to his Ridge Tobacco Store, and park in front of the store. When he got out of the Highlander, C. SINGH opened the rear hatch and removed one 6M (30 carton) case of what appeared to be USA Golds. While walking to the store, SINGH handed the case off to another male who took it into the Ridge Tobacco store. At about 5:04 p.m., C. SINGH left the Ridge Tobacco Store and traveled directly to █████████████████ arriving there at about 5:13 p.m. and surveillance was terminated.

After the deal, Agent Shum met with Agent Campbell who retrieved the recording/transmitting equipment and the $176,740.00 in cash representing C.SINGH's payment for the cigarette order. On December 21, 2007, Agent Campbell deposited this cash into the Commerce Bank Churning Account

### 12/21/07 Undercover Purchase of Untaxed Cigarettes from the Ridge Tobacco Store

On December 21, 2007, ATF-Wilmington personnel made undercover retail purchases of packs of cigarettes from the Ridge Tobacco Store. First, an ATF agent was given $20.00 and entered the Ridge Tobacco Store at approximately 2:14 p.m. This agent purchased one pack of Newport Box 100's for $5.00 and one box of Capri Ultra Slims for $4.45. The agent observed a middle-aged woman working the register and C. SINGH standing behind her helping to pick out the orders. The purchased Newport Box 100's and the Capri Ultra Slims each displayed a genuine Delaware cigarette tax stamp. Thereafter, at approximately 2:21 p.m. as the first agent was leaving the Ridge Tobacco Store, a second ATF agent came into the business. This agent likewise saw the middle-aged woman, known to him through this investigation as S. SINGH, working the register and C. SINGH standing behind her. The second agent ordered one pack of USA Gold Full Flavor and one pack of USA Gold Lights and was charged $2.84 per pack for a total of

$5.68. Unstamped cigarettes from both of these brands were sold to C. SINGH on December 20, 2007. The two packs of cigarettes purchased by the second agent did not have Delaware tax stamps affixed to them as required by law.

## DEAL 10   January 11, 2008

On December 28, 2007, C. SINGH called Investigator Rivera and requested an order of 13,080 cartons of Newports. The Commerce Bank Churning Account had insufficient available funds to pay for C. SINGH's entire order. Accordingly, on January 2, 2008, Agent Campbell placed part of the order (2070 cartons) through another ATF agent, who fronted untaxed, unstamped cigarettes for later payment. On January 8, 2008, Agent Campbell placed the remainder of the SINGH's order for Newports (10,440 cartons) through Lorillard.

On January 8, 2008, Agent Campbell took delivery of the 2,070 cartons of unstamped Newports with an invoiced price of $50,715.00. On January 9, 2008, Agent Campbell received 10,440 cartons of Newports from Lorillard with an invoiced price of $253,065.60 which was paid via wire transfer to Lorillard from the Commerce Bank Churning Account on January 10, 2008. That same day, Investigator Rivera contacted C. SINGH and advised him that the total amount owed for the cigarettes would be $362,790.00.

Prior to the sale of unstamped cigarettes to C. SINGH, an ATF agent photographed a randomly selected pack of cigarettes to show the lack of any indicia of a state tax stamp. As with Deal 9, ATF personnel installed video and audio equipment in the undercover rental truck and provided Investigator Rivera with a recording device and a transmitter. Agent Tat Shum came along on the deal and was assigned to drive the undercover cargo van and assist with the unloading of both the van and the rental truck at the storage facility.

On January 11, 2008, at approximately 2:20 p.m., surveillance personnel secured positions near both Tri-State Storage-Ridge Road and █████████████ Agent Campbell observed C. SINGH driving the Toyota Highlander towards ███████████ ██████. Another ATF agent traveled around the block and parked in position to observe

█████████████. At about 2:38 p.m., Investigator Rivera placed a call to C. SINGH and explained that he was in the area of Tri-State Storage-Ridge Road. At approximately 3:16 p.m., Agent Campbell and the other ATF agent observed C. SINGH leave 126 Shrewsbury Drive carrying what appeared to be a heavy cardboard box, which he placed on the rear seat passenger side of the Toyota Highlander. SINGH then went back inside. A few moments later, C. SINGH came back out of the house carrying what appeared to be a master case of cigarettes. This box was also placed onto the rear passenger seat of the Highlander. C. SINGH was photographed placing both these boxes into the car.

At about 3:18 p.m., C. SINGH got into the Toyota Highlander and traveled towards Claymont, Delaware. C. SINGH arrived at the Tri-State Storage-Ridge Road at about 3:26 p.m., opened the locked gate, and was followed into Tri-State Storage-Ridge by Investigator Rivera and Agent Shum, driving the rental truck and undercover cargo van, respectively. At this point, while the men could not be seen, their conversations could be heard via the transmitter. Investigator Rivera relayed via the transmitter that they were in storage unit number 565 and later confirmed that the cigarettes had been unloaded into this storage unit. Via the transmitter, the unloading of the cigarettes and related discussion could be heard until about 4:30 p.m.

At approximately 4:32 p.m., Investigator Rivera and C. SINGH departed the Tri-State and traveled, at SINGH's request, to ███████████ C. SINGH's home, to count the cash provided for the purchase of the contraband cigarettes. At about 4:40 p.m., C. SINGH and Rivera arrived at ███████████ Via the transmitter, Agent Campbell heard Rivera describe voluminous amounts of cigarettes stored in the basement and garage of ███████████ Rivera stayed at the house for about an hour and a half, the majority of the time spent counting cash (with a money counting machine) at the kitchen table. At approximately 5:30 p.m., Mandeep SINGH arrived at the house and C. SINGH introduced her to Rivera as his daughter.

At approximately 6:10 p.m., Investigator Rivera left ███████████ and traveled directly back to a pre-arranged location, with Agent Campbell and another following him.

Upon arrival, Agent Campbell retrieved the recording and transmitting devices and the $362,970.00 in cash received by Investigator Rivera from C. SINGH for the contraband cigarettes. On January 12, 2008, Agent Campbell, assisted by Investigator Rivera, deposited the $362,790.00 in cash into the Commerce Bank Churning Account.

Investigator Rivera confirmed that the basement and garage of █████████████ were filled with cigarettes. Among other things discussed during this deal, are the following: (1) SINGH explained to Investigator Rivera that he wanted to do even bigger deals with Rivera, approximately every two weeks, including a deal for possibly as much as $500,000 in contraband cigarettes for delivery on or about January 28, 2008. Rivera was not to look for other customers in Delaware because SINGH could take as much as Rivera could supply. He further stated that he had $6.2 million in cigarettes; (2) SINGH indicated that he had $850,000 in cash on the books (and his daughter has $600,000 in the bank), has been using the same bank for fifteen years, and that he makes cash deposits and tells the bank to keep the money aside for him; (3) SINGH further stated that he has eight storage units and has been renting at the storage location for fifteen years[11]; (4) SINGH explained that his house █████████████ was worth $485,000 and he was building a $2,500,000 home on the same piece of real property containing the house in which they counted money during a prior deal █████████████; and (5) SINGH cautioned Rivera to stay away from casinos to exchange small bills for large ones due to concerns about cameras and money laundering.

### 1/30/08 Purchases of Unstamped Cigarettes/Cigarettes with Counterfeit Stamps From Ridge Tobacco and American Cigarette Outlet

On January 30, 2008, two agents from ATF's Wilmington, Delaware office traveled to the Ridge Tobacco Store and to American Cigarette Outlet to purchase cigarettes of the same type as those sold to C.SINGH in the November 19 and December 20, 2007, and January 11, 2008 deals. As detailed above, the investigators had purchased untaxed contraband cigarettes from the Ridge Tobacco Store on December 21, 2007.

---

[11]  Through the course of this investigation, your affiant has identified six storage units held under the names C. SINGH, M.SINGH, S. SINGH, or Ridge Tobacco. Of these known units, five have been used to store contraband cigarettes purchased through this investigation.

### The Ridge Tobacco Store Purchases

The first agent entered the Ridge Tobacco Store at approximately 2:13 p.m. and purchased one carton of Parliament Lights 100s for $38.09 and one carton of Capri Ultra Lights Menthol Super Slims for $48.49. S. SINGH was working the register during this sale. While the Parliaments had Delaware tax stamps on them (determined on January 31, 2008 to be genuine), the Capris bore no tax stamps at all. The second agent ordered one carton of Newport Box 100s from S. SINGH, which he purchased for $36.59. A January 31, 2008 check of the stamps on the Newports determined them to be genuine. During these transactions, C.SINGH entered the store with a young man, spoke in a non-English language with S.SINGH, retrieved an empty half-case cigarette box (with the help of the agent), and left the store in his Toyota Highlander. Traffic conditions prevented the agents from following C.SINGH.

### The American Cigarette Outlet Purchases

The first agent entered American Cigarette Outlet at approximately 2:37 p.m. on January 30, 2008. When the sales attendant helping this agent had trouble understanding the English language, he called on a walkie-talkie and M. SINGH arrived at the counter. At that time, the second ATF agent entered American Cigarette Outlet and was waited on by M. SINGH. This second agent purchased one carton of Newport Box 100s for $34.99 from M. SINGH; the first agent purchased one carton of Parliament Lights 100s for $36.49 and one carton of Capri Ultra Lights Menthol Super Slims for $47.59. All of these cigarettes had what appeared to be Delaware cigarette tax stamps affixed to them.

On January 31, 2008, ATF investigators examined the tax stamps on the cigarettes purchased the day before. The stamps on the Capris appeared genuine. Based on field tests (reaction of the stamps to ultraviolet light and to a standard chemical reagent), investigators concluded the stamps on both the Parliament Lights 100s and the Newport Box 100s sold by M. SINGH likely were not legitimate Delaware tax stamps but rather were counterfeit.

32

## Anticipated February 7, 2008 Deal

On January 28, 2008, at approximately 12:35 p.m., Investigator Rivera's cellular telephone indicated that he had a "missed" call from C. SINGH. On February 1, 2008, at approximately 10:13 a.m., Investigator Rivera recorded a call placed to C.SINGH. SINGH told Rivera that he would call back in two hours, because he wanted to give Rivera his cigarette order over a secured telephone. At 1:15 p.m., Investigator Rivera placed another recorded telephone call to C.SINGH. During the conversation, C.SINGH explained that the next deal would involve approximately $500,000 in cigarettes, which SINGH indicated he would like to break down into two deliveries. SINGH again explained that he wanted to speak on a secure line and so indicated he would call Rivera back later with the order.

On February 2, 2008, at approximately 1:00 p.m., Rivera recorded another call placed to C. SINGH, who explained he would call back in ten minutes. At around 1:19 p.m., C. SINGH called Rivera from telephone ▮▮▮▮▮▮▮ and placed an order for 5160 cartons of Marlboros, 420 cartons of Benson & Hedges, 180 cartons of Capris, 2100 cartons of Kool brand cigarettes, 480 cartons of Virginia Slims, 600 cartons of Parliaments, 1140 cartons of Winstons, 900 cartons of Salems, 5040 cartons of Newports, 660 cartons of USA Golds, and 330 cartons of Camels, for a total order of 17,010 cartons of cigarettes purchased for a total of $465,480.00 in cash.

During that call, C. SINGH again told Rivera that the deal would need to be completed in two deliveries. Rivera explained that he wanted to complete the deal in one day, preferably Wednesday, February 6, 2008. C. SINGH joked that because the deal was for a lot of money he might have to rob a bank to get it done and he continued to push for two deliveries. Rivera and C. SINGH spoke again on Wednesday, February 6, 2008 at which time Rivera indicated to SINGH that he would be coming to Delaware on Thursday, February 7, 2008 to deliver the cigarettes.

33

On or about February 7, 2008, Investigator Rivera will attempt to deliver untaxed Marlboros to C. SINGH to maintain the appearance that Rivera is engaging in the delivery of the contraband cigarettes ordered by C.SINGH. In fact, as soon as the initial untaxed cigarettes are delivered, ATF personnel and other assisting law enforcement officers intend to abort the deal and likely to arrest C. SINGH.

WHEREFORE, based upon the information contained in this affidavit, I believe probable cause exists for the issuance of search warrants for the Subject Premises identified in Attachment A to each individual warrant to search for the items described in Attachment B to each individual warrant.

William J. Campbell
Special Agent, ATF

Dated: February _____, 2008

34

## ATTACHMENT A

## **ATTACHMENT B**

### **ITEMS TO BE SEIZED**

1.    Indicia of occupancy or use of the Subject Premises to include rental, purchase or lease agreements, access codes, and identification documents and keys, to include storage facility keys;

2.    United States and/or foreign currency, rare coins, precious metals, jewelry, and financial instruments, including stocks and bonds, and in amount or with a value in excess of approximately $1,000;

3.    Cigarette tax stamps, whether genuine or counterfeit, and any materials used in making cigarette tax stamps, to include computer images and stamping stock.

4.    Untaxed and/or contraband cigarettes and their packaging.

All of which constitute fruits, evidence and/ or instrumentalities of violations of Title 18, U. S. Code, Sections 2341 et seq.

AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

### DISTRICT OF DELAWARE

In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

| | |
|---|---|
| Storage Units E-210 and E-265 | : |
| 100 Hickman Road | : |
| Claymont, DE 19703, | : CASE NUMBER: 08- 32-M |
| As more particularly described | : |
| in Attachment A | : |
| | : |
| | : |

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

I, **William Campbell,**, being duly sworn depose and say:

I am a(n) **Special Agent Bureau of Alcohol, Tobacco, Firearms, and Explosives** and have reason to believe that

_____ on the person of or __x__ on the property or premises known as (name, description and/or location)

See Attachment A, which is incorporated herein by reference,

in the _____ District of _____ Delaware _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B, which is incorporated herein by reference,

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rule of Criminal Procedure)

property that constitutes evidence of the commission of a criminal offense, the fruits of crime and things criminally possessed and property designed and intended for use and which has been used as a means of committing a criminal offense concerning violations of 18 U.S.C. Sections 2342, 371, and 1956 and 1957.

The facts to support a finding of Probable Cause are as follows:

See attached affidavit of William Campbell , which is incorporated herein by reference.

Continued on the attached sheets and made a part hereof.    __X__ Yes    ___ No

Signature of Affiant
Special Agent

Sworn to before me, and subscribed in my presence

| | | |
|---|---|---|
| **February 7, 2008** | at | **Wilmington, Delaware** |
| Date | | City and State |
| Honorable Leonard P. Stark | | |
| United States Magistrate Judge | | |
| District of Delaware | | |
| Name and Title of Judicial Officer | | Signature of Judicial Officer |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT FOR STORAGE UNITS E-210 and E-265 AT TRI-STATE SELF STORAGE, 100 HICKMAN ROAD, CLAYMONT, DE 19703

I, William J. Campbell, (hereinafter "Agent Campbell" or "your affiant") being duly sworn, depose and state that:

### Purpose of the Affidavit

This affidavit is made in support of a search warrant for storage units E-210 and E-265 located at Tri-State Self Storage, 1050 Ridge Road, Claymont, Delaware 19703, ("the Subject Premises") storage units believed to be occupied/rented by targets Charanjit SINGH, ████████████ (hereinafter "C.SINGH"), and his son, Manjoth SINGH, DOB: ████████ (hereinafter "M.SINGH") both of ████████████████ Wilmington, Delaware 19810.[1]  Through this multi-year investigation, law enforcement officers have learned that C. SINGH, M. SINGH, and C. SINGH's wife, Sunit SINGH, DOB: ████████████████ (hereinafter "S. SINGH") are owners of two Delaware corporations in the business of retail cigarette sales: Raj, Inc. t/a Ridge Tobacco, 315 Ridge Road, Claymont, Delaware 19703 (hereinafter the "Ridge Tobacco Store") and American Cigarette Outlet, Inc., 1401 North DuPont Highway, New Castle, Delaware 19720 (hereinafter "American Cigarette Outlet")[2] which, along with 126 Shrewsbury Drive ("the SINGH residence"), your affiant separately has sought authorization to search.

---

[1]  These Subject Premises are further described in Attachment A to the warrant, incorporated herein by reference. The items to be seized pursuant to this warrant are described in Attachment B, likewise incorporated herein by reference.

[2]  C. and S. SINGH are identified as the owners and corporate officers of the Ridge Tobacco Store on its Delaware business license and registration paperwork. M. and S. SINGH are identified on Delaware license and registration paperwork as the owners and corporate officers of American Cigarette Outlet, which was incorporated in Delaware on February 5, 2007, and began doing business on June 9, 2007.

1

Between May 11, 2007 and January 11, 2008, C. SINGH and M.SINGH are alleged to have violated 18 U.S.C. Section 2342, the Contraband Cigarette Trafficking Act, through ten separate purchases in Delaware of untaxed contraband cigarettes from undercover officers posing as New York-based cigarette smugglers. C.SINGH and M.SINGH have paid the undercovers over $1.1 million dollars for these contraband cigarettes. As a result of these transactions, C. SINGH and M.SINGH and their businesses have avoided approximately $389,000.00 in Delaware cigarette taxes through the investigation to date.

This investigation is being conducted by the ATF (Camden, New Jersey and Wilmington, Delaware Field Offices) with assistance from the New York State Alcohol Tobacco and Petroleum Bureau and the Delaware Division of Revenue. Your affiant has participated in this investigation and is personally familiar with the facts and circumstances of the offenses described herein and/or has obtained the information provided from meetings and discussions with other law enforcement officers, civilians, or has learned the information provided from public records and/or subpoenaed documents. Your affiant is including within this affidavit sufficient information to support probable cause of violations of 18 U.S.C. Section 2342, 18 U.S.C. Section 371, and 18 U.S.C. Section 1956/57 for the requested search warrant for the Subject Premises. Your affiant is not detailing all of his knowledge about the targets, the facts and circumstances under investigation, or the information revealed by this investigation, but rather facts necessary to establish probable cause that evidence of violations of Sections 2342, 371, and/or 1956/57 will be located at the Subject Premises.

### Affiant's Background

Your affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, ("ATF"), United States Department of Justice, and has been so employed since November, 1987.

Your Affiant is a graduate of the Criminal Investigators Training Program conducted at the Federal Law Enforcement Training Center and the ATF National Academy. Your affiant has attended several courses and seminars regarding alcohol and tobacco

2

diversion, money laundering, complex investigations and advanced financial investigations.

During your affiant's employment with the ATF, your affiant has conducted narcotics, firearms, and arson for profit investigations that have involved large-scale conspiracies. By conducting these types of investigations, your affiant has obtained knowledge to recognize the methods used by cigarette and firearms traffickers and others disposed to commit criminal offenses to conceal their criminal activities from law enforcement personnel and others.

As a result of your affiant's training and experience, your affiant is familiar with federal criminal laws relating to contraband cigarette trafficking, conspiracy, and money laundering. As a law enforcement officer, your affiant has participated in numerous arrests and search warrants for various violations of state and federal law. In addition to this experience, your affiant has conducted investigations involving the illegal sale and diversion of cigarettes.

Based on your affiant's training, experience and participation in other financial investigations of illegal activities, especially those involving money laundering, illegal cigarette/counterfeit stamp sales, and contraband cigarette trafficking, your affiant knows the following facts:

        a. Individuals involved in illegal activities for profit often purchase and or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to conceal these assets from law enforcement or regulatory agencies.

        b. Individuals can profit in contraband cigarette trafficking and/or the illegal sale or "diversion" of cigarettes by obtaining untaxed cigarettes and then illegally distributing them for a substantial profit. Individuals involved in these types of illegal cigarette activities for profit are required to conduct large financial transactions to purchase and sell the contraband cigarettes. Often times, the individuals or businesses involved in the sale of contraband cigarettes maintain numerous bank accounts in order that the

3

funds generated can be deposited into the accounts by various means, electronically or in person.

c. It is common for individuals involved in the sale of cigarettes, whether legal or illegal, to maintain books, records, receipts, notes, ledgers, and other papers relating to the order, transportation, sale, and distribution of goods and materials, including the cigarettes themselves; that these aforementioned records and documents are often maintained where the individuals live or, in the case of a business entity, a location readily accessible to those individuals, in the case of a business operation, this is often on the business premises.

d. Individuals involved in illegal cigarette/stamp sales and/or contraband cigarette trafficking commonly maintain addresses and telephone numbers of their associates as well as photographs of themselves, their associates, and their assets. Such information and photographs are commonly maintained within the residences, businesses, vehicles, and/or other locations controlled by those engaged in the illegal cigarette sales and/or contraband cigarette trafficking.

e. Individuals involved in contraband cigarette trafficking generate various types of records and documents which are of a permanent nature, and which must be maintained to facilitate and continue their crime. This information (records of illegal transactions) typically must be readily accessible; therefore, such information is commonly maintained and retained within the residences, businesses, vehicles, and/or other locations under the control of the individuals involved in the illegal cigarette sales.

f. Individuals or businesses involved in contraband cigarette trafficking for profit often utilize electronic equipment, including computers, facsimile machines, currency counting machines, telephone answering machines, pagers, cellular telephones, PDAs and the like in their illicit trade. The aforementioned equipment often stores information relative to the illegal cigarette sales and is often maintained within the residences, businesses, vehicles, and/or other locations controlled by those engaged in the illegal cigarette/counterfeit stamp sales and/or contraband cigarette trafficking.

Your Affiant alleges that the facts outlined below demonstrate probable cause to issue search warrant for the Subject Premises, further described in Attachment A.

Your affiant has reason to believe that, if the requested search warrant is granted, there will be found items, specifically identified in Attachment B to the warrant, which will reflect and document the following criminal offenses, including Title 18, U.S.C. Section 2342, the contraband cigarette trafficking act and Title 18, U.S.C. Section 371,

4

conspiracy, including conspiracy to violate 18 U.S.C. Section 2342 and 18 U.S.C. Section 1956/57 (money laundering). Your affiant further believes that these items will include property that constitutes evidence of these offenses, the fruits of these crimes, and things criminally possessed and property designed and intended for use, and which has been used, as a means of committing these offenses.

Your affiant bases these conclusions upon the following information:

## Background:  Core Concepts for Understanding Contraband Cigarette Trafficking

A "cigarette" is defined in 18 U.S.C. § 2341(1) as "(A) any roll of tobacco wrapped in paper, or in any substance not containing tobacco; and (B) any roll of tobacco wrapped in any substance containing tobacco which, because of its appearance, the type of tobacco used in its filler, or its packaging and labeling, is likely to be offered to, or purchased by, consumers as a cigarette." Domestic cigarettes are normally packaged in packs; each pack usually contains twenty or twenty-five sticks of cigarettes. There are normally ten packs of twenty cigarettes to a carton. A carton is the largest unit provided for retail sale. Cartons are packaged either in half cases or "master" cases, known in the industry as "6M" and "12M" cases, respectively. A 6M case contains 6,000 individual cigarette sticks; a 12M case contains 12,000 individual cigarette sticks.

Your affiant knows that every state in the United States imposes some tax (within a wide range) on the retail sale of cigarettes. The liability for these state taxes generally arises once the cigarettes enter the jurisdiction of the state. Delaware, like all but two of these states, requires indicia of the cigarette tax to be affixed on each individual unit (pack) of cigarettes via a state tax stamp or imprint to demonstrate that the state tax has been paid. Only cigarettes stamped with a Delaware tax stamp are permitted to be sold in Delaware to retail customers; cigarettes bearing stamps from any other state are contraband. In Delaware, your affiant is aware that certain out-of-state wholesale distributors are licensed as the state's cigarette stamping agents. As such, they are generally responsible for the payment of the state tax and for affixing the tax stamp on each individual pack of cigarettes prior to delivery to retail dealers, such as the targets of this investigation. When this investigation began, Delaware's cigarette tax was $0.55 per pack. On August 1,

5

2007, Delaware increased its cigarette tax to $1.15 a pack. Even with the increase in price, Delaware's cigarette tax remains substantially lower than the tax levied on cigarettes by the states of New Jersey or New York.

The term "contraband cigarettes" as defined in 18 U.S.C. § 2341(2), means "a quantity in excess of 10,000 cigarettes which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if (as everywhere except North Carolina, North Dakota, Native American reservations and certain military installations) the State or local government requires [a tax stamp or indicia of tax payment] to be placed on the packages or other containers of cigarettes to evidence payment of cigarette taxes. . . ." Subject to narrow, specific exemptions, all cigarettes possessed by anyone in Delaware other than a licensed Delaware stamping agent must have Delaware tax stamp affixed to each pack of cigarettes in their possession, thereby demonstrating that the state's or locality's cigarette tax has been properly paid by the stamping agent.

Your affiant is aware that illegal interstate trafficking in untaxed cigarettes deprives the states of millions of dollars in cigarette tax revenues. Recognizing that the range in state cigarette taxes creates a potential for interstate trafficking in cigarettes to avoid (a higher) state tax, the United States Congress enacted the Contraband Cigarette Trafficking Act, Title 18, United States Code, Section 2341 et seq., making it unlawful for any person, other than an "exempt person," described below, to ship, transport, receive, possess, sell, distribute, or purchase "contraband cigarettes" as previously defined.[3]

As described below, the cigarettes purchased by C. SINGH and M. SINGH throughout this investigation did not have Delaware tax stamps on them. Moreover, your affiant has confirmed that neither C. SINGH, M. SINGH, nor their businesses, the Ridge Tobacco

---

[3] An exempt person is classified generally as a cigarette manufacturer, export warehouse proprietor, customs bonded warehouse, common carrier, political subdivision, foreign trade zone, and/or licensed distributor authorized to account for and to pay the state-imposed tax and in compliance with all accounting and payment requirements.

6

Store or American Cigarette Outlet have been a licensed cigarette stamping agent in Delaware during the period under investigation. Instead, targets C. SINGH and M.SINGH (and their businesses) were and are retail distributors who can legally purchase stamped (taxed) cigarettes only from certain wholesale distributors functioning as Delaware's stamping agents. As such, it is a violation of federal and Delaware law[4] for the targets or their businesses to be in possession of untaxed (unstamped) cigarettes, as defined above.

Like many states, Delaware sets minimum wholesale per carton prices for cigarette sales to retailers. (Delaware has no minimum retail price; however, the minimum wholesale price obviously affects the retailers' ability to profit from the sale of cigarettes sold below that price.[5]) To assist retailers, cigarette manufacturers offer retailers "promotional payments" commonly referred to in the industry as "buy down programs" on particular brands of cigarettes. The buy down programs are designed to increase the sale of certain cigarettes at retail stores by reducing a retailer's cost over a defined period of time. These payments allow the retailer to pass some of this savings along to their customers, by selling those products closer to the wholesale price they paid for the cigarettes. These promotional payments can account for as much as 80% of profit on a carton of cigarettes.

By way of example, at present, Lorillard Tobacco Co. ("Lorillard"), the manufacturer of Newport cigarettes, offers Delaware retailers a buy-down of approximately $6.50 per carton. Through this investigation, your affiant has become aware that, during the 2007 calendar year, the Ridge Tobacco Store did not participate in buy-down programs provided by the three major cigarette manufacturers, Philip Morris USA ("Philip Morris),

---

[4] *See* Delaware Code, Title 30, Section 5242 (2007).

[5] Your affiant is aware that the profit margin for cigarette sales is small, often approximating $1.00 per carton. Many retailers, such as convenience stores and gas stations, can increase profits by selling their cigarettes at higher per pack prices to consumers who purchase one or two packs at a time from them. By contrast, "cigarette outlet" retailers, such as the targets of this investigation, whose primary products are cigarettes and tobacco products, must sell their cigarettes at a very small profit margin in order to retain their customers.

7

Case 1:08-mj-00033-UNA    Document 4-2    Filed 02/08/2008    Page 53 of 84

Lorillard, and R.J. Reynolds Tobacco Co. ("R.J. Reynolds"). (It appears that C.SINGH has and does participate in buy-down programs with Leggett and Commonwealth.) Representatives of Lorillard explained that they stopped doing business with Ridge Tobacco several years ago due to C. SINGH's refusal to follow the requirements of Lorillard's promotional buy-down programs.[6]

## Investigation: 2004-2005

In approximately September 2004, as part of an investigation into contraband cigarettes and counterfeit cigarette tax stamp trafficking in Delaware, Pennsylvania, New Jersey and New York, your affiant learned that a confidential informant (hereinafter "CI -001") had been identified by ATF Camden as knowledgeable in the distribution of untaxed cigarettes. CI-001 reported that he/she had access to individuals in Delaware who were selling counterfeit cigarette tax stamps and engaging in illegal cigarette trafficking. The CI likewise informed the ATF that he/she had been selling up to 2,000 cartons per week of what were believed to be stamped cigarettes to an individual known to the CI as "Raj," telephone number ▮▮▮▮▮▮ who drove a black Toyota Highlander bearing Delaware registration ▮▮▮▮▮ registered to Sunit K. SINGH (hereinafter the "Toyota Highlander"). CI-001 described Raj as a male of Middle-Eastern descent, in his early 20s, with a beard.

CI-001 related that Raj told him/her that Raj was involved in removing the Delaware tax stamps from the cigarettes he was purchasing from CI-001 and replacing them with counterfeit New Jersey cigarette tax stamps. Subsequent investigation identified Raj as Manjoth SINGH, ▮▮▮▮▮▮▮▮▮, Wilmington, Delaware 19810 ("M. SINGH"). The telephone subscriber information for telephone number ▮▮▮▮▮▮ then and

---

[6] Because the Ridge Tobacco Store does not participate in the major manufacturer's buy down programs, it cannot legitimately sell its cigarettes for less than cost (the minimum wholesale price) without incurring losses on every sale. As described in more detail below, on January 30, 2008, an ATF agent, acting in an undercover capacity, purchased a carton of Newport Box 100's from the Ridge Tobacco Store for $36.59. This price is less than the legitimate minimum wholesale price for the cigarettes in Delaware and, if the cigarettes sold were not purchased through contraband cigarette trafficking, would actually result in a <u>loss</u> of $3.88 per carton to the store.

now comes back to Charanjit SINGH, ████████████████ Wilmington, Delaware 19810 ("C. SINGH"). Subsequent investigation determined that C. SINGH was M. SINGH's father. Telephone number (████████████ was already known to ATF Camden through subpoenaed telephone records as being a telephone number called by a target of an ATF contraband cigarette investigation.

In March 2005, while conducting surveillance of a Pennsylvania resident who was a target of an ATF contraband cigarette investigation, and who is hereinafter identified as CI-002, the target was seen parking his/her vehicle in the driveway of ██████████████ ████, the SINGH residence, receiving what appeared to be three cases of cigarettes.

In August 2005, CI-001 contacted ATF Camden and advised that C. SINGH approached CI-001 and introduced himself as "Tony," Raj's father. CI-001 indicated that Tony asked if CI-001 could sell Tony as much SKOAL (smokeless tobacco) as the CI could supply. C. SINGH told CI-001 that he could sell SKOAL at his 7-11 store in New York. Tony provided CI-001 his cellular telephone number ████████████ C. SINGH has used this telephone number throughout this investigation; it is subscribed to by his daughter, Mandeep SINGH, DOB: ████████████████ Wilmington, Delaware 19810.

In October 2005, a previous target and later CI (hereinafter "CI-002") was questioned regarding, among other things, his/her dealings with M. SINGH and C. SINGH. CI-002 said that he/she purchased cigarettes from Tony and Raj, Tony's son. He/she purchased cigarettes with Delaware tax stamps from Tony at the Ridge Tobacco Store for the purpose of reselling the cigarettes (affixed with new counterfeit stamps) in Pennsylvania and New York, states with higher cigarette taxes. He/she also stated that he/she purchased Delaware-stamped cigarettes from Raj at his house, where he stored the cigarettes in his garage. Indeed, CI-002 said that on one occasion he/she observed unstamped cigarettes in Raj's garage.

9

### Churning Authority – May 2006

On December 8, 2004, ATF was granted legal "churning authority" permitting the agency, with respect to any undercover investigative operation necessary for the detection and prosecution of crimes against the United States, do the following:

    (A) use appropriated sums to purchase property, buildings, and other facilities, and for leasing space, within the United States, the District of Columbia, and the territories and possession of the United States;

    (B) use appropriated sums to establish or to acquire proprietary corporations entities as part of an undercover investigative operation, and to operate such corporations or business entities on a commercial basis;

    (C) deposit appropriated sums and the proceeds from such undercover operation, in banks or other financial institutions, without regard to section 648 of Title 18 of the United States Code and section 3302 of Title 31 of the United States Code; and

    (D) use proceeds from such undercover operation to offset necessary and reasonable expenses incurred in such operation.

On May 10, 2006, Agent Campbell received authority to open up a churning account for use in undercover operations in connection with this investigation. Accordingly, Agent Campbell opened account number ███████ with Commerce Bank (hereinafter the "Commerce Bank Churning Account") on October 2, 2006.

### Investigation 2007 – The Contraband Cigarette Deals

In summary, from May 11, 2007 through January 11, 2008, C. SINGH and M.SINGH purchased approximately 40,000 cartons of unstamped contraband cigarettes through this undercover investigation. C. and M. SINGH have paid approximately $1.1 million in cash to undercover officers for these cigarettes. All profits from these sales were redeposited into the Commerce Bank Churning Account. On every occasion, the sales price for the contraband cigarettes has been below Delaware's minimum lawful wholesale price. These deals are described as follows to establish sufficient probable cause to believe that evidence, fruits or instrumentalities of violations of 18 U.S.C.

Section 2341 *et seq.*, and/or 18 U.S.C. Section 371 and/or 18 U.S.C. Section 1956/57 will be located within the Subject Premises your affiant seeks authority to search.

On May 2, 2007, at approximately 2:00 p.m., ATF Special Agent William Campbell recorded a telephone call from CI-002 to M. SINGH at telephone number ▉▉▉▉▉. During that call, CI-002 told M. SINGH that he/she had a source for Newport and Marlboro cigarettes and that the source could sell Newports at $28.00 per carton and Marlboros at $27.50 per carton. This call was made from ATF's Camden Field Office; CI-002 left shortly after the call was made. After CI-002 left, at around 2:15 p.m., CI-002 called New York State Department of Taxation & Finance Investigator Steve Rivera (hereinafter "Investigator Rivera"). Investigator Rivera previously had been working with ATF on this investigation and was familiar with CI-002. During that call, CI-002 told Rivera that Raj just telephoned him/her, indicated that he had spoken with his (Raj's) father, and explained that his father was interested in purchasing the offered cigarettes but at a lower price: $27.00 per carton for both brands.

On May 3, 2007, CI-002 met with Sunit SINGH ("S. SINGH") at the Ridge Tobacco Store. The meeting was not recorded. This investigation has determined that S. SINGH is C.SINGH's wife and M.SINGH's mother; she is also a co-owner of both the Ridge Tobacco Store and the American Cigarette Outlet. At the conclusion of this meeting, Agent Campbell and Investigator Rivera met with CI-002, who provided the following information. S.SINGH told CI-002 that neither Raj (M. SINGH) nor Tony (C. SINGH) were present at the Ridge Tobacco Store at the time of the meeting. Nevertheless, according to CI-002, S. SINGH advised him/her that Tony would be interested in purchasing 1000-2000 cartons of cigarettes from CI-002 on a regular basis. S. SINGH then called Tony and handed the phone to CI-002. According to CI-002, Tony was interested in purchasing cigarettes from CI-002's source for $27.00 per carton for the Newports and $27.50 for the Marlboros. CI-002 said Tony told him/her to contact Raj when the cigarettes became available.

11

## DEAL 1   MAY 11, 2007

On May 7, 2007, CI-002 contacted M. SINGH and arranged the sale of cigarettes from undercover Investigator Rivera, aka "Teo." M. SINGH ordered 1,000 cartons of Newports, 840 cartons of Marlboros. The agreed-upon price for these cigarettes was $27.00 per carton. As was the case with all subsequent cigarette purchases between Investigator Rivera and M. and C. SINGH, this price was below the Delaware legal minimum wholesale price for these cigarettes brands at the time. Additionally, CI-002 is not and did not represent herself as a licensed cigarette wholesaler.

Arrangements were set for delivery on May 11, 2007. On May 10, 2007, CI-002 contacted M. SINGH, who requested to meet CI-002 on May 11, 2007 at 12:30 p.m. Agent Campbell was able to purchase 1,080 cartons of Newports utilizing funds from the Commerce Bank Churning Account; he was not able to purchase the requested Marlboro cigarettes. Because the Newports were delivered from the manufacturer, the packs bore no state tax stamps. Once he took delivery of the cigarettes, Agent Campbell opened a random case and photographed a random pack of cigarettes for the purpose of demonstrating the lack of a tax stamp on the packs.

At approximately 12:44 p.m. on May 11, 2007, CI-002 placed a telephone call to M.SINGH, who advised CI-002 to travel to the WaWa store at the corner of Naamans Road and Ridge Road, Claymont, Delaware located near the Ridge Tobacco Store (hereinafter "the WaWa Store") M. SINGH was to meet CI-002 and Investigator Rivera, posing undercover as his/her cigarette supplier. Rivera and the CI were traveling in a rented cargo van loaded with the contraband cigarettes. Rivera was fitted with a transmitter prior to the meeting with M. SINGH.

At approximately 1:25 p.m., Agent Campbell and another agent observed Investigator Rivera following a silver Infiniti G35, Delaware license number ███ registered to Charanjit and Manjoth Singh (hereinafter "the Infinity G35") into Tri-State Self Storage, 100 Hickman Road, Claymont, Delaware 19703 (hereinafter "Tri-State Storage-Hickman"). Rivera's cargo van was traveling between the Infiniti G35 and a white 2004 BMW X-5; Delaware license ███, registered to Charanjit Singh ("the BMW X-

12

5"). All three cars entered Tri-State Storage-Hickman. At approximately 1:27 p.m., Investigator Rivera advised via the transmitter that he, CI-002, M. SINGH and C. SINGH met together at storage unit E-210.

Information from Tri-State Self Storage indicates that, as of January 8, 2008, Ridge Tobacco, 315 B Ridge Road, Claymont, Delaware 19703 was the renter/occupant of unit E-210.

Via the transmitter, Agent Campbell heard Investigator Rivera in conversation with at least one other male regarding the sale of cigarettes. At approximately 1:50 p.m., Agent Campbell was able to determine the transaction was coming to a close. A few minutes later, Rivera advised that he was departing the storage area. At about 2:00 p.m., Agent Campbell met with Investigator Rivera and CI-002 at a rest area on I-95 where Agent Campbell retrieved the transmitting device and $29,160.00 in cash from Rivera representing the funds M. SINGH and C. SINGH paid for the contraband cigarettes.

Investigator Rivera provided the following information relating to his sale of contraband cigarettes to M. and C. SINGH. M. SINGH provided the name "Frank" to Rivera and opened the gate to Tri-State Storage by entering a code. C. SINGH followed them into the facility in the BMW X-5. Rivera was then led to storage unit E-210, which C. SINGH unlocked and opened. Within unit E-210, Rivera observed approximately 100 to 150 6M cases of USA Gold brand cigarettes.[7] M. SINGH instructed Rivera to back his van to the door of E-210. C. SINGH then opened a case of the unstamped contraband cigarettes provided by Rivera and examined them to verify that the cigarettes were legitimate Philip Morris Marlboros and not counterfeit product. C. SINGH told M. SINGH to get the money to pay for the cigarettes, and M. SINGH went to one of the vehicles and returned carrying money. C.SINGH began counting the money, as did Rivera and CI-002. The cash totaled $29,160.00. This cash was subsequently deposited into the Commerce Bank Churning Account.

---

[7]    In general, when a stamping agent stamps cigarettes from the manufacturer, the cases must be cut in half for the purpose of removing cartons and running the packs through the stamping machine. Those cigarettes are then re-packaged in half cases.

### DEAL 2   MAY 24, 2007

On May 17, 2007, Investigator Rivera called M. SINGH at telephone number █████ ████ and received an order for 1,380 cartons of Newports from M. SINGH. M. SINGH also requested Marlboros at this time as well. Previously, M. SINGH and Investigator Rivera had agreed upon a price of $27.00 per carton.

On May 23, 2007, Agent Campbell ordered 1,380 cartons of Newports from Lorillard, wiring $32,761.20 from the Commerce Bank Churning Account to pay for the cigarettes. Agent Campbell took delivery of the cigarettes on May 24, 2007. Because these cigarettes were delivered from the manufacturer, the packs bore no state tax stamps. Campbell photographed the untaxed cigarettes and loaded them into the undercover van. That same day, Investigator Rivera was provided with an audio recorder and a transmitter and, at approximately 1:43 p.m. he arrived at the WaWa Store and telephoned M. SINGH.

At approximately 2:04 p.m., Agent Campbell observed M. SINGH arriving at the WaWa Store in the Infiniti G-35; however, Agent Campbell's view was obstructed and he could not see Investigator Rivera and M. SINGH drive away from the parking lot. Investigator Rivera could be heard via the transmitter indicating he was inside the premises of Tri-State Storage-Hickman. At some point during the meeting, C. SINGH arrived on location in a 2004 Toyota Highlander, Delaware license █████ registered to Sunit K. Singh ("the Toyota Highlander") and joined the discussion with Investigator Rivera. At about 2:26 p.m., M. SINGH departed the storage area. Thereafter, at approximately 2:35 p.m., Agent Campbell observed both Investigator Rivera and C. SINGH driving south on Hickman Road. Agent Campbell followed Investigator Rivera's cargo van to a rest stop on I-95 where he met with Rivera and retrieved the recording and transmitting devices and $37,260 in cash. This currency subsequently was deposited into the Commerce Bank Churning Account.

Rivera explained that the contraband cigarettes were loaded into storage unit E-210, where he also observed approximately 200 cases of USA Golds and two master cases of

Newports. Investigator Rivera also observed M. SINGH retrieve the money for the deal from the Infiniti G35.

### DEAL 3   JUNE 1, 2007

On May 25, 2007, at approximately 3:05 p.m., Agent Campbell recorded a call from Investigator Rivera to M. SINGH at telephone number ███████. M. SINGH placed an order for 1,400 cartons of Marlboros and 1,380 cartons of Newports, agreeing to a delivery at the end of the following week.

On May 29, 2007, Agent Campbell placed an order for cigarettes thru Molokai Alexander, ATF Tobacco Branch, for 1,440 cartons of Marlboros from Philip Morris and 840 cartons of Newports from Lorillard. The balance in the Commerce Bank Churning Account was insufficient to pay for M. SINGH's entire order.

On June 1, 2007, Agent Campbell took delivery of the 2,280 cartons of unstamped Newports and Marlboros. Because these cigarettes were delivered from the manufacturers, the packs bore no state tax stamps. Campbell opened a random carton, photographed the cigarettes to show they were unstamped, and loaded them into the undercover cargo van. On the same day, at approximately 1:05 p.m., Investigator Rivera telephoned M. SINGH at telephone number ███████ and told M. SINGH that he would meet him in about one and one-half hours. Investigator Rivera was then provided with recording and transmitting devices. At approximately 3:00 p.m., ATF personnel took up surveillance positions near Tri-State Storage-Hickman. Shortly thereafter, Investigator Rivera arrived at the WaWa Store parking lot and telephoned M. SINGH to let him know he was waiting.

At about 3:36 p.m., M. SINGH arrived at the WaWa Store driving the Infiniti G-35, and Rivera followed M. SINGH to Tri-State Storage-Hickman. Agent Campbell observed Investigator Rivera follow M. SINGH inside of the facility. Investigator Rivera announced via the transmitter that he followed M. SINGH to a new storage unit, number E-265.

Information from Tri-State Self Storage indicates that, as of January 8, 2008, Manjoth Singh, ███████████ Wilmington, DE 19810 was the renter/occupant of unit number E-265.

Surveillance units could hear Investigator Rivera and M. SINGH discussing the cigarettes and counting money. At about 4:26 p.m., Investigator Rivera and M. SINGH departed the storage facility. Surveillance was broken off at this time, and Agent Campbell followed Investigator Rivera to ATF Camden where Agent Campbell retrieved the recording and transmitting devices and $61,560.00 in cash from Investigator Rivera representing the cash paid by M. SINGH for the unstamped cigarettes. These funds were subsequently deposited into the Commerce Bank Churning Account.

### DEAL 4   June 21, 2007

On June 18, 2007, M. SINGH called Investigator Rivera and ordered 1,200 cartons of Newport cigarettes and 1,500 of Marlboros to be delivered for $27.00 per carton. Rivera advised M. SINGH he could deliver the cigarettes later in the week. That same day, Agent Campbell wire transferred $17,999.75 from the Commerce Bank Churning Account to Philip Morris and $28,488.00 to Lorillard to pay for the untaxed cigarettes ordered by M. SINGH.

On June 21, 2007, Agent Campbell took possession of the unstamped Marlboros and Newports and they were loaded into the undercover cargo van. Because the cigarettes were delivered from the manufacturer, the packs bore no state tax stamps. A sample carton of both the Newports and Marlboros was photographed to show this lack of a tax stamp. At approximately 12:32 p.m. on that day, Investigator Rivera called M. SINGH at telephone number ███████████ and left a message for "Frank" to return his call. About a half-hour later, Investigator Rivera called M. SINGH again, told him the requested cigarettes were available, and indicated that they could meet around 2:30 p.m. While M. SINGH had not been expecting Rivera until the next day, SINGH was willing to do the deal anyway.

At approximately 2:15 p.m., Agent Campbell provided Investigator Rivera with a transmitter and a recording device, and he arrived at the WaWa Store and placed a call to

M. SINGH at around 2:48 p.m. According to Rivera, M. SINGH told him he would be there in five minutes. At approximately 3:00 p.m., M. SINGH called Rivera and told him his (Singh's) father would meet Rivera instead, arriving in about twenty minutes.

At about 3:45 p.m., C. SINGH arrived at the WaWa Store driving the Toyota Highlander. Rivera made contact and followed C. SINGH to Tri-State Self Storage-Hickman where they stayed until approximately 4:40 p.m., during which time Investigator Rivera and C. SINGH unloaded the 2,700 cartons of cigarettes from the undercover cargo van into storage unit E-265 and counted the cash payment. After the meeting, Agent Campbell and another ATF agent followed Rivera directly from Tri-State Storage-Hickman north on I-95 to a rest area. Agent Campbell retrieved the recorder and transmitter and a black travel bag containing $72,900.00 in cash representing C.SINGH's payment to Rivera for the unstamped cigarettes. These funds were deposited into the Commerce Bank Churning Account.

### DEAL 5   JULY 13, 2007

On July 4, 2007, C. SINGH called Investigator Rivera and placed an order for 2,100 cartons of Newports and 600 cartons of Philip Morris brand cigarettes, agreeing again to pay Rivera $27.00. On July 8, 2007, Investigator Rivera received a message from "Frank," (M. SINGH) regarding this order.

On July 10, 2007, Agent Campbell purchased 2,100 cartons of unstamped Newports from Lorillard for $49,854.00 and 600 cartons of cigarettes from Philip Morris for $7,199.90, wire transferring payment for the cigarettes from the Commerce Bank Churning Account.

On July 11, 2007, C. SINGH called Investigator Rivera and left a message expressing his interest in meeting with Rivera in New York because C. SINGH was then in Long Island. Later that same day, C. SINGH called Rivera again and left a message requesting delivery of the previously ordered 2,700 cartons on July 14 or 15, 2007. Because the requested delivery was on a weekend, Rivera returned C. SINGH's call on July 12th and advised SINGH that he could only deliver the cigarettes on July 13, 2007, a Friday.

On July 13, 2007, Agent Campbell took delivery of 600 cartons of Marlboros and 2,100 cartons of Newports which were then photographed and loaded into the cargo van. Because these cigarettes were delivered from the manufacturers, the packs bore no state tax stamps. At approximately 3:15 p.m., Agent Campbell provided Investigator Rivera with a transmitter and a recorder. At 3:40 p.m., Investigator Rivera called C. SINGH and informed C. SINGH he was on his way and would soon be in the area of the Wawa Store.

At about 4:00 p.m., surveillance teams were in position near Tri-State Storage-Hickman. C. SINGH arrived at the WaWa Store at about 4:15 p.m. in the Toyota Highlander. Investigator Rivera followed C. SINGH to Tri-State Storage-Hickman. After approximately one-half hour, Investigator Rivera called Agent Campbell to advise that he was following C. SINGH to another location to count the money from the sale of the untaxed cigarettes. Mobile surveillance was maintained as the two vehicles turned onto Naamans Road. Rivera indicated via the transmitter that he was turning into the driveway at ██████████████ Wilmington, Delaware 19810 and instructed surveillance vehicles not to follow. Accordingly, surveillance units set up in the area nearby.

At approximately 5:21 p.m., Agent Campbell observed Rivera's undercover cargo van following the Toyota Highlander onto Naamans Road after exiting the driveway of ██████████. Investigators followed the undercover van to a rest stop on northbound I-95 where Agent Campbell retrieved a black bag containing $72,900.00 in cash representing C. SINGH's payment to Rivera for the contraband cigarettes. Those funds were subsequently deposited into the Commerce Bank Churning Account.

Investigator Rivera explained that the untaxed cigarettes purchased in this deal were unloaded from the cargo van into unit number E-265 at Tri-State Storage-Hickman. Rivera said that C. SINGH told him he owned a 7-11 store in New York and that a number of individuals from New York travel to Delaware and purchase cigarettes from C. SINGH. C. SINGH recommended to Rivera that he rent a bus to carry cigarettes;

18

noting that a bus could hold approximately 300 cases. C.SINGH also indicated that he would buy 300 cases (18,000 cartons) per month from Rivera in the future.

Rivera further explained that the cash payment for this contraband cigarette deal was counted at a house owned by C. SINGH located at ███████████ C. SINGH explained to Rivera that he bought the property with cash at a sheriff's sale for $340,000, but claimed its current value was $3.6 million. (C. SINGH allegedly is building another home on the property at ███████████ this house is in poor condition.) C. SINGH further explained that he had workers living in the house rent free because they worked for him 12 hours a day. Investigator Rivera verified the $72,900 cash payment for the contraband cigarettes through a money counting machine located in the kitchen of the house at ███████████

### DEAL 6   August 21, 2007

On July 23, 2007, C. SINGH called Investigator Rivera to order 2,700 cartons of Philip Morris and R. J. Reynolds cigarettes. On August 1, 2007, Agent Campbell ordered the required amount of cigarettes to fill C. SINGH's order from Philip Morris and R.J. Reynolds, respectively, wire transferring $26,189.04 to Philip Morris and, eventually, $1,110.24 to R.J. Reynolds from the Commerce Bank Churning Account to pay for these cigarettes.

On August 12, 2007, Agent Campbell called Investigator Rivera and requested that he call C. SINGH to advise him of the price of the cigarettes, which was increasing on certain brands. As a result of that conversation, the total amount to be received from C. SINGH for the order above was $81,540.00.

On August 21, 2007, at approximately 10:30 a.m., the 2,700 cartons of untaxed cigarettes ordered by C. SINGH were loaded into the undercover cargo van. Because the cigarettes were delivered from the manufacturers, the packs bore no state tax stamps. Prior to loading, Agent Campbell photographed random packs of each brand of cigarette to show the lack of any state tax stamp on the individual packs. At approximately 3:45 p.m., Agent Campbell provided Rivera with transmitting and recording devices. About one-

half hour later, Rivera arrived at the parking lot of the Wawa Store. At this time Agent Campbell instructed Rivera to call C. SINGH, who was already in the Wawa Store parking lot in the BMW X5. Via the transmitter, Rivera could be heard talking with C. SINGH, and then Agent Campbell watched Rivera follow C. SINGH to Tri-State Self Storage-Hickman.

From approximately 4:24 p.m. until about 5:45 p.m., Rivera and C. SINGH remained inside Tri-State Storage-Hickman. At about 5:45 p.m., C. SINGH left the storage area with Rivera following in his undercover van. Rivera advised that C. SINGH was now traveling to get a copy of an invoice to show Rivera to prove the price of the Virginia Slims because they had disagreed about the price for this brand. At about 5:49 p.m., Investigator Rivera arrived back at the WaWa Store to wait for C. SINGH. At about 6:15 p.m., Agent Campbell observed C. SINGH arrive at the WaWa Store parking lot, park the BMW X5 next to Rivera's undercover van, and hand Rivera paperwork through the window, which Rivera accepted and which River later turned over, explaining they were two copies of wholesaler invoices for Virginia Slims, with the wholesaler's name whited out, and a handwritten note from C. SINGH. Agent Campbell was able to determine that the invoices were from the American Cigarette Outlet.

At about 6:20 p.m., C. SINGH left the area. Rivera left shortly thereafter and traveled to a pre-arranged location, followed by Agent Campbell and another. At about 6:30 p.m., Agent Campbell met with Rivera and retrieved the recorder, transmitter, and $80,000.00 in cash representing C. SINGH's payment for the untaxed cigarettes. Those funds were subsequently deposited into the Commerce Bank Churning Account. Rivera reported that he and C. SINGH unloaded cases of untaxed cigarettes into storage unit numbers E-265 and E-210, and that he saw several cases of Wild Horses brand cigarettes (a brand not sold by Investigator Rivera) within unit E-265. The money for this deal ($80,000 of the previously negotiated $81,540) was counted, using a money counter, within unit E-265 after the cigarettes were unloaded.

Rivera further reported that, while at Tri-State Storage-Hickman, C.SINGH explained that he sold his untaxed cigarettes to individuals from New York, but he kept his cigarette

businesses in Delaware and Long Island, New York legitimate. C.SINGH discussed gradually increasing the volume of untaxed cigarettes he bought from Rivera. During the deal, Investigator Rivera reminded C.SINGH that this transaction was not through legitimate channels so he could not compare prices with the wholesaler invoices provided.

### DEAL 7  August 30, 2007

On August 6, 2007, Investigator Rivera and C.SINGH had a further discussion about Rivera's price increases. Investigator Rivera explained that added risks and Delaware's price increase (a tax increase per pack from $.55 to $1.15 that went into effect August 1, 2007) would affect his price. The men continued to negotiate on price. On August 28, 2007, Investigator Rivera called C. SINGH and received an order for 2,700 cartons of Newports for delivery on August 30 or 31, 2007. The agreed-upon price was $29.00 per carton plus the $1,540 discrepancy from the prior deal.

On August 28, 2007, AGENT Campbell purchased 2,700 cartons of unstamped Newports from Lorillard, and wire transferred $64,098.00 from the Commerce Bank Churning Account to pay for them. On August 30, 2007, Campbell took delivery of the unstamped Newports, loaded them into the undercover cargo van, opened a random carton to verify that there were no state tax stamps affixed to the packs and photographed the cigarettes. At approximately 2:00 p.m. that same day, Agent Campbell provided Investigator Rivera with transmitter and recording devices. Approximately one-half hour later, Rivera arrived at the WaWa Store parking lot and called C. SINGH. At approximately 2:45 p.m., Rivera advised that C. SINGH had arrived in the Toyota Highlander and that Rivera was following him to Tri-State Storage-Hickman. Via the transmitter, Rivera advised that he and C.SINGH were in front of storage unit E-265.

For about the next hour, Rivera and C. SINGH could be heard in conversation regarding the sale of cigarettes and both could be heard counting cash. Thereafter, at about 3:42 p.m., C. SINGH and Rivera departed Tri-State Storage-Hickman in their separate vehicles. ATF agents followed C. SINGH back to his residence at ███████████ and observed him entering the home. Other ATF personnel followed Rivera directly

from Tri-State Storage-Hickman to a pre-arranged meeting location. At approximately 4:00 p.m., Agent Campbell met with Rivera and retrieved the transmitting and recording equipment. Investigator Rivera also provided Agent Campbell with a handwritten order for additional cigarettes from C. SINGH and a plastic "Aloha Hawaii" bag containing $79,840.00 in cash, which represented C. SINGH's payment for the contraband cigarettes. Agent Campbell deposited these funds into the Commerce Bank Churning Account.

Investigator Rivera reported that C.SINGH explained more about his contraband cigarette trafficking business during the August 30, 2007, deal, including, but not limited to, the following information: (1) C. SINGH indicated that he had a steady stream of smugglers from New York as customers and that he had been smuggling cigarettes for eleven years and using the same storage units for eight years. SINGH told his smuggler customers that prices were going to increase in response to his discussion with Rivera on the prior deal. While at one time he used fifteen suppliers, C. SINGH was now down to four (including Rivera); (2) C. SINGH claimed that none of the cigarettes delivered by Rivera went to his stores because he kept the stores legitimate and that he had about 245,000 cartons worth of legitimate cigarettes. C. SINGH also claimed "Raj's" (his son, M. SINGH)'s business (American Cigarette Outlet) likewise was legitimate[8] and that he (Raj) was selling 3,000 cartons per day; (3) C. SINGH explained that he wanted to build up his business with Investigator Rivera to multiple deliveries per month and cautioned Rivera against traveling through Maryland when transporting contraband cigarettes; (4) With respect to the bag in which the money for the unstamped cigarettes was transported, C. SINGH explained that he recently had traveled to Hawaii for his twenty-fifth wedding anniversary.

---

[8]  As discussed below, these claims were demonstrated to be false through undercover purchases of unstamped cigarettes and cigarettes bearing counterfeit stamps at the Ridge Tobacco Store on December 21, 2007 and January 30, 2008 and at American Cigarette Outlet on January 30, 2008.

### DEAL 8  November 19, 2007

On October 19, 2007, C. SINGH called Investigator Rivera and placed an order for 3,060 cartons of Newports, explaining that he (SINGH) had lots of customers. (Rivera earlier had stalled C. SINGH claiming supplier problems; Rivera continued with this stalling tactic after the October 19, 2007 order was placed.)

On November 8, 2007, Agent Campbell recorded a telephone call from Investigator Rivera to C. SINGH, made in response to a call from SINGH to Rivera the day before. This time, C. SINGH placed a second order (in addition to that from October 19, 2007) for 2,640 cartons of Parliaments and 1,800 cartons of Capris; the negotiated price was $29.00 per carton. The potential purchase of USA Gold brand cigarettes was also discussed.

On November 15, 2007, Agent Campbell wire transferred $31,679.56 to Philip Morris and $74,174.46 to Lorillard from the Commerce Bank Churning Account to pay for the untaxed cigarettes ordered by C.SINGH.  On November 16, 2007, at approximately 1:30 a.m., Rivera telephoned C. SINGH and told him the cigarettes would be delivered November 19, 2007, and that, accordingly, C. SINGH should have $217,500.00 available in cash (7,500 cartons x $29.00 = $217,500.00), specifically requesting $100 bills if possible.  C. SINGH indicated he would try.

On November 19, 2007, Agent Campbell rented a delivery truck into which were loaded 2,640 cartons of unstamped Parliaments and 3,060 cartons of unstamped Newports for a total of 5,700 cartons (for a total price of $165,300).  Delivery of the Capris was delayed. At approximately 2:45 p.m. that same day, Investigator Rivera called C. SINGH and advised him that he was about 15 minutes away from meeting him at Tri-State Storage-Hickman.  Agent Campbell provided Rivera with recording and transmitting devices and, at about 3:30 p.m., Rivera moved the rental truck near the front gate of Tri-State Storage-Hickman to await C. SINGH's arrival.  Shortly thereafter, C. SINGH arrived, driving the Toyota Highlander.  After a few minutes, Rivera advised via the transmitter that C. SINGH was taking him to a different location.

At about 3:30 p.m., with ATF vehicles providing mobile surveillance, C. SINGH and Rivera traveled to another Tri-State Self Storage facility at nearby 1050 Ridge Road,

Claymont, DE, 19703 (hereinafter "Tri-State Storage-Ridge Road"). Via the transmitter, Rivera advised that he was following C. SINGH into the storage facility to unit number 460.

Information from Tri-State Self Storage indicates that, as of January 8, 2008, Charanjit Singh, ███████████████ Wilmington, Delaware 19810 was the renter/occupant of unit number 460.

Via the transmitter, Rivera was heard unloading cases of the untaxed cigarettes, talking about the sale of contraband cigarettes, and counting currency until both men departed Tri-State Storage-Ridge Road at approximately 5:41 p.m. ATF personnel, including Agent Campbell, followed Rivera back to the original briefing location; no surveillance was maintained on C. SINGH after he left Tri-State Storage-Ridge Road. Agent Campbell retrieved the recording and transmitting devices from Investigator Rivera, as well as a Coors Light soft-side cooler bag containing $165,300.00 in cash representing C. SINGH's payment for the cigarette order. Thereafter, on November 20, 2007, Agent Campbell deposited this cash into the Commerce Bank Churning Account.

Among other things, Investigator Rivera confirmed that when he arrived at unit 460 for this deal, he saw what appeared to be 50-100 6M cases of USA Gold and Newport cigarettes already in the unit. C.SINGH claimed to Investigator Rivera that he (SINGH) sold approximately 90,000 cartons of USA Golds per week. SINGH further indicated his interest in obtaining USA Golds from Rivera, noting that, in addition to Rivera, he (SINGH) also obtains contraband cigarettes from a Spanish-speaking supplier named "Anna" with a good connection in North Carolina.[9] C. SINGH explained that he would be getting rid of some of the untaxed cigarettes the following morning, before he left with his wife for Switzerland. Moreover, if Investigator Rivera was able to obtain the additional requested cigarettes -- Capris that had not been delivered by Rivera -- by the

---

[9] Your affiant is aware that "Anna" is the target of an ATF cigarette smuggling investigation based out of the Western District of North Carolina. Undercover sales to "Anna" have occurred on or about 4/20/07, 11/06/07, 11/16/07, 12/03/07, and 1/22/2008. These sales total approximately 10,000 cartons.

following day, Rivera was to call "Frank," (son M. SINGH) to do the deal.[10] Investigator Rivera also noted that he and C.SINGH used SINGH's money counting machine at this meeting as they had previously. Finally, unlike the other deals, some of the stacks of cash C. SINGH paid to Rivera for the untaxed cigarettes were provided in money wrappers from Delaware National Bank's Branmar Plaza branch in North Wilmington.

The day after this deal, November 20, 2007, ATF agents conducted mobile surveillance of C. SINGH. At 9:00 a.m., agents saw SINGH leaving             in the Toyota Highlander, but then lost sight of him. At 9:15 a.m., other units found the Toyota Highlander parked at the Ridge Tobacco Store. About 10 minutes later, C. SINGH was seen leaving the Ridge Tobacco Store and driving to Tri-State Storage-Ridge Road. Eventually, SINGH parked the car in the area of unit 460 and made the first of multiple trips to a storage unit, returning to the car with cigarettes. On his initial trip, C. SINGH was seen carrying what appeared to be five master cases from a storage unit; on each of the subsequent trips he retrieved 3-4 cartons of cigarettes. All these cigarettes were placed into the Toyota Highlander. At around 9:45 a.m., C. SINGH locked a storage unit door and drove out of the facility to the nearby Ridge Tobacco Store where he parked and went inside. About twenty minutes later, C. SINGH came out of the store, removed all five cases and several single cartons of cigarettes from the Toyota Highlander and entered the store with them.

### DEAL 9   December 20, 2007

On December 11, 2007, Investigator Rivera made a telephone call to C. SINGH, who placed an order for 2,130 cartons of USA Golds (various types), and 2,400 cartons of Newports, for a total order of 4530 cartons. C. SINGH previously had agreed to pay $29.00 per carton for the Newports, $35.00 per carton for the Capris (originally ordered by C. SINGH for delivery during the November 19, 2007 deal), and $19.00 per carton for

---

[10] On November 20 and 23, 2007, Investigator Rivera received telephone calls from "Frank," (M. SINGH) about the missing delivery of Capri cigarettes, because his father, C. SINGH, was in Switzerland. Rivera made excuses for why the cigarettes could not be delivered.

the USA Golds. On this same day, Agent Campbell ordered 2,130 cartons of unstamped USA Gold cigarettes from Big Tobacco Sales, Inc., agreeing to pay $17.50 per carton.

On December 17, 2007, Big Tobacco Sales, Inc. delivered the USA Golds to Agent Campbell; however, only 2,070 cartons were delivered and the invoice total of $36,225.00 reflected this change.

On December 18, 2007, C.SINGH ordered an additional 600 cartons of Newports from Investigator Rivera. On this same day, Investigator Rivera called C. SINGH and informed him that delivery would take place on December 20, 2007. In addition, Investigator Rivera told C. SINGH he (SINGH) would get the delivery even if he had to send someone else.

On December 19, 2007, AGENT Campbell ordered 3,000 cartons of Newports from Lorillard, wiring $72,720.00 from the Commerce Bank Churning Account to pay for them. Because the Newports were delivered from the manufacturer, the packs bore no state tax stamps. Agent Campbell also wired $36,225.00 at this time to Big Tobacco Sales, Inc. for the USA Golds which likewise bore no state tax stamp.

On December 20, 2007, Investigator Rivera called C. SINGH and advised that instead of coming to the deal himself, Rivera was going to send "Ah Cho" to deliver the cigarettes. Ah Cho is identified as undercover ATF Agent Tat Shum.

On December 20, 2007, at approximately 10:45 a.m., ATF agents loaded a rented truck with 2,070 cartons of USA Gold cigarettes, 1,440 cartons of Capris, and 3,000 cartons of Newports, which previously had been delivered to Agent Campbell, and transported these unstamped cigarettes from Camden, New Jersey to Wilmington, Delaware. ATF personnel photographed a random pack of cigarettes within the supply in the van to show the lack of any state tax stamp.

26

On that same day, at approximately 1:15 p.m., Investigator Rivera called C. SINGH and advised him that "Ah Cho" would meet him (SINGH) in the Taco Bell restaurant parking lot, 609 Naamans Road, Claymont, Delaware, between 2:30-3:00 p.m. After installing audio and video tape recording equipment into the undercover van, ATF personnel provided Agent Shum with a recording device and transmitter as well.

On December 20, 2007, at approximately 2:44 p.m., Agent Shum arrived at the Taco Bell restaurant parking lot in the rental truck and waited for C. SINGH. About ten minutes later, C. SINGH arrived in the Toyota Highlander. Via the transmitter, SINGH could be heard instructing Agent Shum to follow him to another location and C. SINGH and Agent Shum were followed to the Tri-State Storage-Ridge Road. Agent Campbell saw both the Highlander and the rental truck stopped near the office just inside the gate. A few minutes later, Agent Campbell observed Agent Shum following C. SINGH in the rental truck. Agent Shum advised via the transmitter that he followed C. SINGH to unit number 468 and that a Tri-State employee unlocked the unit for C. SINGH. At this point, via the transmitter, Agent Shum and C. SINGH could be heard unloading the cases of cigarettes from the truck.

Information from Tri-State Self Storage-Ridge Road indicates that, as of January 8, 2008, Charanjit Singh, ███████████████ Wilmington, DE 19810 was the renter/occupant of unit number 468.

At approximately 3:45 p.m., the cigarettes had been unloaded from the van and C. SINGH told Agent Shum that he was not comfortable counting the money where they were because of two unknown individuals. Accordingly, the men moved their cars to a different location within the Tri-State Storage-Ridge Road facility.

At about 3:52 p.m., Agent Campbell could hear Agent Shum and C. SINGH begin to count the money within the truck, utilizing a money counter. The videotape recording of this deal shows C. SINGH placing the money counter on the dashboard of the rental truck and then counting the cash in groups of several thousand dollars at a time. At

27

approximately 4:30 p.m., all of the cash had been counted, the deal was concluded and C. SINGH let Agent Shum out of the Tri-State Storage-Ridge Road facility. SINGH stayed at the storage facility. ATF personnel observed C.SINGH return to the approximate area within the storage facility where he and Agent Shum had unloaded the cigarettes into unit 468. At approximately 4:40 p.m., Agent Campbell observed C. SINGH leave Tri-State Storage-Ridge Road in the Toyota Highlander, travel directly to his Ridge Tobacco Store, and park in front of the store. When he got out of the Highlander, C. SINGH opened the rear hatch and removed one 6M (30 carton) case of what appeared to be USA Golds. While walking to the store, SINGH handed the case off to another male who took it into the Ridge Tobacco store. At about 5:04 p.m., C. SINGH left the Ridge Tobacco Store and traveled directly to ▮▮▮▮▮▮▮▮▮▮▮▮▮ arriving there at about 5:13 p.m. and surveillance was terminated.

After the deal, Agent Shum met with Agent Campbell who retrieved the recording/transmitting equipment and the $176,740.00 in cash representing C.SINGH's payment for the cigarette order. On December 21, 2007, Agent Campbell deposited this cash into the Commerce Bank Churning Account

### 12/21/07 Undercover Purchase of Untaxed Cigarettes from the Ridge Tobacco Store

On December 21, 2007, ATF-Wilmington personnel made undercover retail purchases of packs of cigarettes from the Ridge Tobacco Store. First, an ATF agent was given $20.00 and entered the Ridge Tobacco Store at approximately 2:14 p.m. This agent purchased one pack of Newport Box 100's for $5.00 and one box of Capri Ultra Slims for $4.45. The agent observed a middle-aged woman working the register and C. SINGH standing behind her helping to pick out the orders. The purchased Newport Box 100's and the Capri Ultra Slims each displayed a genuine Delaware cigarette tax stamp. Thereafter, at approximately 2:21 p.m. as the first agent was leaving the Ridge Tobacco Store, a second ATF agent came into the business. This agent likewise saw the middle-aged woman, known to him through this investigation as S. SINGH, working the register and C. SINGH standing behind her. The second agent ordered one pack of USA Gold Full Flavor and one pack of USA Gold Lights and was charged $2.84 per pack for a total of

$5.68. Unstamped cigarettes from both of these brands were sold to C. SINGH on December 20, 2007. The two packs of cigarettes purchased by the second agent did not have Delaware tax stamps affixed to them as required by law.

## DEAL 10   January 11, 2008

On December 28, 2007, C. SINGH called Investigator Rivera and requested an order of 13,080 cartons of Newports. The Commerce Bank Churning Account had insufficient available funds to pay for C. SINGH's entire order. Accordingly, on January 2, 2008, Agent Campbell placed part of the order (2070 cartons) through another ATF agent, who fronted untaxed, unstamped cigarettes for later payment. On January 8, 2008, Agent Campbell placed the remainder of the SINGH's order for Newports (10,440 cartons) through Lorillard.

On January 8, 2008, Agent Campbell took delivery of the 2,070 cartons of unstamped Newports with an invoiced price of $50,715.00. On January 9, 2008, Agent Campbell received 10,440 cartons of Newports from Lorillard with an invoiced price of $253,065.60 which was paid via wire transfer to Lorillard from the Commerce Bank Churning Account on January 10, 2008. That same day, Investigator Rivera contacted C. SINGH and advised him that the total amount owed for the cigarettes would be $362,790.00.

Prior to the sale of unstamped cigarettes to C. SINGH, an ATF agent photographed a randomly selected pack of cigarettes to show the lack of any indicia of a state tax stamp. As with Deal 9, ATF personnel installed video and audio equipment in the undercover rental truck and provided Investigator Rivera with a recording device and a transmitter. Agent Tat Shum came along on the deal and was assigned to drive the undercover cargo van and assist with the unloading of both the van and the rental truck at the storage facility.

On January 11, 2008, at approximately 2:20 p.m., surveillance personnel secured positions near both Tri-State Storage-Ridge Road and ████████████████. Agent Campbell observed C. SINGH driving the Toyota Highlander towards ████████████ ████. Another ATF agent traveled around the block and parked in position to observe

29

███████████. At about 2:38 p.m., Investigator Rivera placed a call to C. SINGH and explained that he was in the area of Tri-State Storage-Ridge Road. At approximately 3:16 p.m., Agent Campbell and the other ATF agent observed C. SINGH leave ██████████████ carrying what appeared to be a heavy cardboard box, which he placed on the rear seat passenger side of the Toyota Highlander. SINGH then went back inside. A few moments later, C. SINGH came back out of the house carrying what appeared to be a master case of cigarettes. This box was also placed onto the rear passenger seat of the Highlander. C. SINGH was photographed placing both these boxes into the car.

At about 3:18 p.m., C. SINGH got into the Toyota Highlander and traveled towards Claymont, Delaware. C. SINGH arrived at the Tri-State Storage-Ridge Road at about 3:26 p.m., opened the locked gate, and was followed into Tri-State Storage-Ridge by Investigator Rivera and Agent Shum, driving the rental truck and undercover cargo van, respectively. At this point, while the men could not be seen, their conversations could be heard via the transmitter. Investigator Rivera relayed via the transmitter that they were in storage unit number 565 and later confirmed that the cigarettes had been unloaded into this storage unit. Via the transmitter, the unloading of the cigarettes and related discussion could be heard until about 4:30 p.m.

At approximately 4:32 p.m., Investigator Rivera and C. SINGH departed the Tri-State and traveled, at SINGH's request, to ██████████████ C. SINGH's home, to count the cash provided for the purchase of the contraband cigarettes. At about 4:40 p.m., C. SINGH and Rivera arrived at ██████████████. Via the transmitter, Agent Campbell heard Rivera describe voluminous amounts of cigarettes stored in the basement and garage of ██████████████. Rivera stayed at the house for about an hour and a half, the majority of the time spent counting cash (with a money counting machine) at the kitchen table. At approximately 5:30 p.m., Mandeep SINGH arrived at the house and C. SINGH introduced her to Rivera as his daughter.

At approximately 6:10 p.m., Investigator Rivera left ██████████████ and traveled directly back to a pre-arranged location, with Agent Campbell and another following him.

Upon arrival, Agent Campbell retrieved the recording and transmitting devices and the $362,970.00 in cash received by Investigator Rivera from C. SINGH for the contraband cigarettes. On January 12, 2008, Agent Campbell, assisted by Investigator Rivera, deposited the $362,790.00 in cash into the Commerce Bank Churning Account.

Investigator Rivera confirmed that the basement and garage of ███████████████ were filled with cigarettes. Among other things discussed during this deal, are the following: (1) SINGH explained to Investigator Rivera that he wanted to do even bigger deals with Rivera, approximately every two weeks, including a deal for possibly as much as $500,000 in contraband cigarettes for delivery on or about January 28, 2008. Rivera was not to look for other customers in Delaware because SINGH could take as much as Rivera could supply. He further stated that he had $6.2 million in cigarettes; (2) SINGH indicated that he had $850,000 in cash on the books (and his daughter has $600,000 in the bank), has been using the same bank for fifteen years, and that he makes cash deposits and tells the bank to keep the money aside for him; (3) SINGH further stated that he has eight storage units and has been renting at the storage location for fifteen years[11]; (4) SINGH explained that his house ███████████████ was worth $485,000 and he was building a $2,500,000 home on the same piece of real property containing the house in which they counted money during a prior deal ███████████ and (5) SINGH cautioned Rivera to stay away from casinos to exchange small bills for large ones due to concerns about cameras and money laundering.

### 1/30/08 Purchases of Unstamped Cigarettes/Cigarettes with Counterfeit Stamps From Ridge Tobacco and American Cigarette Outlet

On January 30, 2008, two agents from ATF's Wilmington, Delaware office traveled to the Ridge Tobacco Store and to American Cigarette Outlet to purchase cigarettes of the same type as those sold to C.SINGH in the November 19 and December 20, 2007, and January 11, 2008 deals. As detailed above, the investigators had purchased untaxed contraband cigarettes from the Ridge Tobacco Store on December 21, 2007.

---

[11]    Through the course of this investigation, your affiant has identified six storage units held under the names C. SINGH, M.SINGH, S. SINGH, or Ridge Tobacco. Of these known units, five have been used to store contraband cigarettes purchased through this investigation.

### The Ridge Tobacco Store Purchases

The first agent entered the Ridge Tobacco Store at approximately 2:13 p.m. and purchased one carton of Parliament Lights 100s for $38.09 and one carton of Capri Ultra Lights Menthol Super Slims for $48.49. S. SINGH was working the register during this sale. While the Parliaments had Delaware tax stamps on them (determined on January 31, 2008 to be genuine), the Capris bore no tax stamps at all. The second agent ordered one carton of Newport Box 100s from S. SINGH, which he purchased for $36.59. A January 31, 2008 check of the stamps on the Newports determined them to be genuine. During these transactions, C.SINGH entered the store with a young man, spoke in a non-English language with S.SINGH, retrieved an empty half-case cigarette box (with the help of the agent), and left the store in his Toyota Highlander. Traffic conditions prevented the agents from following C.SINGH.

### The American Cigarette Outlet Purchases

The first agent entered American Cigarette Outlet at approximately 2:37 p.m. on January 30, 2008. When the sales attendant helping this agent had trouble understanding the English language, he called on a walkie-talkie and M. SINGH arrived at the counter. At that time, the second ATF agent entered American Cigarette Outlet and was waited on by M. SINGH. This second agent purchased one carton of Newport Box 100s for $34.99 from M. SINGH; the first agent purchased one carton of Parliament Lights 100s for $36.49 and one carton of Capri Ultra Lights Menthol Super Slims for $47.59. All of these cigarettes had what appeared to be Delaware cigarette tax stamps affixed to them.

On January 31, 2008, ATF investigators examined the tax stamps on the cigarettes purchased the day before. The stamps on the Capris appeared genuine. Based on field tests (reaction of the stamps to ultraviolet light and to a standard chemical reagent), investigators concluded the stamps on both the Parliament Lights 100s and the Newport Box 100s sold by M. SINGH likely were not legitimate Delaware tax stamps but rather were counterfeit.

32

**Anticipated February 7, 2008 Deal**

On January 28, 2008, at approximately 12:35 p.m., Investigator Rivera's cellular telephone indicated that he had a "missed" call from C. SINGH. On February 1, 2008, at approximately 10:13 a.m., Investigator Rivera recorded a call placed to C.SINGH. SINGH told Rivera that he would call back in two hours, because he wanted to give Rivera his cigarette order over a secured telephone. At 1:15 p.m., Investigator Rivera placed another recorded telephone call to C.SINGH. During the conversation, C.SINGH explained that the next deal would involve approximately $500,000 in cigarettes, which SINGH indicated he would like to break down into two deliveries. SINGH again explained that he wanted to speak on a secure line and so indicated he would call Rivera back later with the order.

On February 2, 2008, at approximately 1:00 p.m., Rivera recorded another call placed to C. SINGH, who explained he would call back in ten minutes. At around 1:19 p.m., C. SINGH called Rivera from telephone (302) 529-9170 and placed an order for 5160 cartons of Marlboros, 420 cartons of Benson & Hedges, 180 cartons of Capris, 2100 cartons of Kool brand cigarettes, 480 cartons of Virginia Slims, 600 cartons of Parliaments, 1140 cartons of Winstons, 900 cartons of Salems, 5040 cartons of Newports, 660 cartons of USA Golds, and 330 cartons of Camels, for a total order of 17,010 cartons of cigarettes purchased for a total of $465,480.00 in cash.

During that call, C. SINGH again told Rivera that the deal would need to be completed in two deliveries. Rivera explained that he wanted to complete the deal in one day, preferably Wednesday, February 6, 2008. C. SINGH joked that because the deal was for a lot of money he might have to rob a bank to get it done and he continued to push for two deliveries. Rivera and C. SINGH spoke again on Wednesday, February 6, 2008 at which time Rivera indicated to SINGH that he would be coming to Delaware on Thursday, February 7, 2008 to deliver the cigarettes.

33

On February 7, 2008, Rivera spoke to C. Singh regarding which storage unit would be used for the planned delivery of cigarettes.

C. Singh explained he rented a new, bigger, unit which would allow for more covert ingress and egress, referring to the delivery of contraband cigarettes.

Rivera then asked about the contents of the additional storage units used previously (referring to the units that are the subject of this affidavit). Singh explained that the units had cigarettes in them and also had a variety of items associated with his retail cigarette business.

WHEREFORE, based upon the information contained in this affidavit, I believe probable cause exists for the issuance of a search warrant for the Subject Premises identified in Attachment A to search for the items described in Attachment B to the warrant.

William J. Campbell
Special Agent, ATF

Dated: February __7__, 2008

Sworn to and subscribed before
me this 7th February 2008

Perl. R

## <u>ATTACHMENT A - STORAGE UNITS 460, 468, and 565 AT</u>

## <u>TRI-STATE SELF STORAGE-RIDGE ROAD</u>

**Storage Units 460, 468, and 565, 1050 Ridge Road, Claymont, Delaware, 19703** are more particularly described as individual storage units within a large outdoor self-storage facility, on the east side of Ridge Road, Claymont, Delaware, comprised of long rows of individual storage units, each individually numbered. A sign on the property describes the business as "TRI STATE MINI STORAGE." Each individual unit has an orange garage type roll up door. The property has a large automated steel gate at the entrance to the business. Units 460, 468 and 565 bear those respective numbers on the top center of the door frame for each of the units.

## ATTACHMENT B

### ITEMS TO BE SEIZED

For items 1 through 9 inclusive, the items to be seized are for the time period January 2004 to the present.

1.    Books, records, receipts, notes, ledgers, or electronic data relating in any way to the importation, transportation, ordering, purchase, sale, taxation and/or distribution of contraband cigarettes, counterfeit cigarette tax stamps, and/or illegal cigarette sales or diversions;

2.    Papers, tickets, notes, receipts, passports and other items relating to domestic and international travel.

3.    Books, records, invoices, receipts, records of real estate transactions, records of purchase, sale and financing of assets and investments, including stocks, bonds and other securities, bank statements and related records, passbooks, money drafts, loans, letters of credit, money orders, bank drafts, cashier's checks, credit and debit cards, bank checks, money orders or any other negotiable instruments, safe deposit box keys (as well as applications, records of payment for and/or entry records of all safe deposit boxes), money wrappers, and other items relating in any way to the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of contraband cigarette trafficking proceeds and/or proceeds from illegal cigarette/counterfeit stamp sales or diversions;

4.    Bank and financial institution records and other records showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency.

5.    Photographs, records, and documents -- including still photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides -- containing

38

information regarding the identities of coconspirators or those involved in contraband cigarette trafficking and/or illegal cigarette/counterfeit cigarette tax stamps sales;

6.     Any papers, records or electronic data reflecting names, addresses, telephone numbers, IP or e-mail addresses, pager numbers, facsimile numbers and/or telex numbers of co-conspirators, sources of contraband cigarettes, and contraband cigarette/counterfeit cigarette tax stamp customers, which may be found in (but not limited to) the following media: address and/or telephone books, rolodex indices, electronic personal organizers, calendars, papers, web sites, telephone paging devices (and the memory thereof), and mobile cellular telephones (and the memory thereof);

7.     Indicia of occupancy, residency, and ownership or use of the Subject Premises any computers searched, and including, but not limited to, utility, telephone, and Internet access bills, insurance records, canceled envelopes, rental, purchase or lease agreements, identification documents and keys, to include storage facility keys;

8.     For Raj, Inc. and/or American Cigarette Outlet, Inc., reports and accountant's workpapers concerning preparation of financial records and reports and audits, including, but not limited to, audited and unaudited financial statements, expense and revenue summaries, trial balances, changes in working capital, cash flow analysis, cost analysis, financial forecasts, and correspondence.

9.     Tax returns (both federal and state, sales, and employment tax returns and any amendments) for Raj., Inc., American Cigarette Outlet, Inc., Charanjit Singh, Sunit Singh (nee: Chawla), Mandeep Singh, and Manjoth Singh for the tax years 2004 through 2007.

10.     United States and/or foreign currency, rare coins, precious metals, jewelry, and financial instruments, including stocks and bonds, and in amount or with a value in excess of approximately $1,000;

11.     Articles of Incorporation, corporate minutes, and/or any partnership agreements for Raj, Inc. and/or American Cigarette Outlet, Inc.

12.    Records indicating the purchase, lease, rental, or possession of real estate.

13.    Cigarette tax stamps, whether genuine or counterfeit, and any materials used in making cigarette tax stamps, to include computer images and stamping stock.

14.    Untaxed and/or contraband cigarettes and their packaging.

The above paragraphs 1 through 14, inclusive, include all of the foregoing items of evidence in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stores, including, but not limited to, any handmade form (such as writing); any photocopies; any mechanical form (such as printing or typing); any electrical, electronic, or magnetic form or data (such as any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-Roms, flash (thumb) drives, printer buffers, as well as printouts or readouts from any magnetic storage device.)

In addition, computer hardware, software, documentation, passwords, data security devices, and data, as further described below and in the affidavit incorporated by reference into this search warrant, are also to be seized and searched off-site in the matter which is also described below, and in the affidavit incorporated by reference into this search warrant. "Mirroring," imaging," and/or replication are also authorized.

The items to be seized include any and all electronic devices that are capable of analyzing, creating, displaying or transmitting electronic or magnetic computer impulses or data. These devices include computers, cell phones, telephones, electronic organizers, personal digital assistants (PDAs), fax machines, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryptions circuit boards, optical scanners, external hard drives, and other computer-related electronic devices.

The items to be seized include any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.

The items to be seized include any and all written or printed material that provides instructions or examples concerning the operation of a computer system, computer software and/or any related device.

The items to be seized include any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment. This media includes, but is not limited to, floppy disks, diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and any other media which is capable of storing magnetic code.

Appropriate efforts shall be made to minimize the disclosure of records and other information which are not the subject of this warrant.

All of which constitute fruits, evidence and/ or instrumentalities of violations of Title 18, U. S. Code, Sections 1956, 1957, 2315, and 2341 et seq.